Estate of Frank Iaconi, Deceased, Angelo J. Iaconi, Administrator v. Commissioner.
Estate of Iaconi v. Commissioner
Docket Nos. 39511, 39512.
United States Tax Court
T.C. Memo 1961-106; 1961 Tax Ct. Memo LEXIS 244; 20 T.C.M. (CCH) 502; T.C.M. (RIA) 61106; April 13, 1961
*244 Held: 1. Income of taxpayer determined by use of increase in net worth plus expenditures method. 2. Various properties acquired were purchased with funds owned by petitioner. 3. False and fraudulent returns with intent to evade tax were filed for all the taxable years, and part of each deficiency is due to fraud with intent to evade tax. Secs. 276(a) and 293(b). 4. The determinations of deficiencies for 1945, 1946, and 1947 are not barred, secs. 275(c), 276(a), 276(b); and jeopardy assessments of taxes and additions thereto for the same years under section 273(a) were not barred. 5. Additions to tax under section 294(d)(2) for the years 1945-1949, inclusive, are sustained, but no such addition to the tax for 1950 may be imposed. Commissioner v. Acker, 361 U.S. 87. 6. Additions to the tax for 1950 under secs. 291(a) and 294(d)(1)(A) are sustained. 7. The filing of the petitions in this Court, under section 277, suspended the running of the statute of limitations on the collection of the deficiencies in income tax and additions to tax which were assessed in jeopardy by the respondent and were thereafter before the Court for determination, until the Court's decision becomes final and *245 for 60 days thereafter. Lester H. Salter, Esq., and James R. McGowan, Esq., for the petitioner. Frank V. Moran, Esq., and John M. Doukas, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: For the years 1945-1950, inclusive, the Commissioner originally determined income tax deficiencies, 50 percent additions to the deficiencies under section 293(b), and additions to tax under section 294(d)(2), 1939 Code, in the following amounts: Sec.
Year
Deficiency
Sec. 293(b)
294(d)(2)
1945
$ 5,773.05
$ 2,886.53
$ 325.87
1946
22,278.73
11,139.37
1,427.17
1947
59,689.25
29,844.63
3,518.57
1948
37,185.72
18,592.86
2,290.33
1949
107,036.78
53,518.39
6,474.17
1950
29,372.01
14,686.01
1,766.24 He also made additions to the tax for 1950 under section 291(a) in the amount of $2,937.20, and section 294(d)(1)(A) in the amount of $3,024.43. The Commissioner made claims for increases in the deficiencies and additions, under section 272(e), for 1945, 1946, and 1948. He now claims that there are deficiencies and additions in the following total amounts: Sec.
Year
Deficiency
Sec. 293(b)
294(d)(2)
1945
$ 18,500.45
$ 9,250.23
$1,089.51
1946
23,136.15
11,568.08
3,570.02
1948
81,534.23
40,767.62
4,951.24
The Commissioner, *246 by use of the increase in net worth plus expenditures method, determined that Frank Iaconi realized income in each of the 6 taxable years, 1945-1950, which was substantially in excess of the income reported in his returns. The chief question is whether Iaconi realized income in each of the taxable years, and the amounts thereof, which he failed to report. In the event of a determination that he had unreported income in any of the taxable years, additional questions are whether all or any part of a deficiency was due to fraud with intent to evade tax, or whether deficiencies for 1945, 1946, and 1947 are barred by the statute of limitations. Other issues are: Whether an addition to tax for 1950 is due under section 291(a); whether there were substantial underestimates of estimated tax for the years 1945-1950, inclusive, requiring additions to taxes under section 294(d)(2); and whether for 1950 an addition to the tax may be made under section 294(d)(1)(A), for which year no declaration of estimated tax was filed. By amendments to the petitions, the petitioner has presented the following question: Whether the 6-year period of limitations provided by section 276(c), 1939 Code, bars collection *247 of that part of the deficiencies assessed in jeopardy in October and December 1951 which was not collected within such 6-year period. Findings of Fact Angelo J. Iaconi is the duly appointed administrator of the estate of Frank Iaconi, deceased, hereinafter referred to as Iaconi. Iaconi died intestate on July 14, 1956, a resident of Worcester, Massachusetts, at the age of 61 years. He died before the trial of these cases but after the dates when the deficiency notices were mailed, which dates were December 27, 1951, and January 18, 1952. Iaconi filed individual income tax returns for the taxable years 1945-1950, inclusive, with the collector of internal revenue for the district of Massachusetts. Iaconi's survivors are his widow, Mary Iaconi, and 4 children. Their names, years of birth, and ages in 1945 and 1956 are as follows: Ages
Ages
Birth
in
in
Names
Years
1945
1956
Mary Iaconi
1897
48
59
Salvatore Iaconi
1917
28
39
Angelo Iaconi
1919
26
37
Florence Lombardi
1923
22
33
Caroline Moretti
1925
20
31 Iaconi was born in Italy on April 17, 1895; he came to the United States in 1913, when he was 18 years old; he married Mary in 1916; and he became a naturalized citizen in 1937. Iaconi spoke Italian throughout his *248 life, never having learned to speak English easily; he spoke English brokenly. He never attended any school. He did not learn the English alphabet and could not read or write English. His wife taught him to write his name. Mary Iaconi, called Mary herein, was born in Italy. She came to the United States in 1902, when she was 5 years old. She attended school through the fourth grade. She speaks English. She started working when she was 14 years old; she worked in various factories in Massachusetts; she also worked in her father's fruit store. She was 20 years old when she married. After her marriage, except for a few months, she was employed by the Norton Grinding Company in Greendale, Massachusetts. In about 1917 or soon thereafter, after the birth of her second child, she stopped working for Norton Grinding Company and remained at home. Salvatore's education stopped at the end of the second year of high school. He was married in 1935. Salvatore is also called Sully. Angelo attended grammar and high schools in Worcester. After graduating from high school, he attended a business college for 1 year. He entered military service in April 1942 and went overseas in 1944. He received his *249 discharge from the service in January 1946 and was married in that year. He is also called Chester. Florence attended grammar and high schools in Worcester, and a college (1941-1945) in Springfield, Massachusetts. She married in January 1950. Caroline attended grammar and high schools in Worcester, and a college (1944-1948) in Hooksett, New Hampshire. She married in 1949. Iaconi worked at various jobs, as an employee, from 1913 until 1924. In 1916, he was an employee in a tannery in Worcester. Later, he worked for the Norton Grinding Company; and thereafter he worked in a butcher shop. After he gave up a job in 1924, he was not thereafter, during the rest of his life, an employee, but he was self-employed in various ventures and, also, he was at times employed by a corporation in which members of the Iaconi family owned the entire interest. In 1927, or before, real estate located at 21 Berkeley Street in Worcester was acquired in the names of Iaconi and his wife. A residence and garage were constructed on this property and the Iaconis began living there in about 1928. They maintained this home thereafter at all times material. They lived there continuously, except for short absences *250 when they went away for vacations and trips. In 1924 and thereafter, the Iaconis spent vacations in Florida. In 1938 the Iaconis acquired property, on which they built a summer home, at Misquamicut Beach, Rhode Island, which is 83 miles from Worcester. During the years 1945-1950, they lived at their summer home from April or May until October or November, during which months they visited Worcester once or twice a week. During the years 1945-1950, the Iaconis went to Miami Beach, Florida, during the fall and winter months. Ordinarily they stayed in Florida from October or November until April or May of the following year. Up to 1948, they rented accommodations. In 1948, the Iaconis purchased a house in Miami Beach. There is no record in the Internal Revenue Service's records showing that Iaconi filed any income tax returns for any year up to and including 1927. According to the records of the Service, the first return filed by Iaconiwas for the year 1928, when a no-tax-due return was filed by Iaconi. For the years 1929 and 1930, there is no record of the filing of a return in Iaconi's name; for 1931, there is a record of the filing of a no-tax-due return filed in Iaconi's name; for *251 1932, there is no record of the filing of a return in Iaconi's name; for 1933, there is a record of the filing of a no-tax-due return in Iaconi's name; there are records of the filing of returns in Iaconi's name for the years 1934 through 1950. Returns filed in Iaconi's name for the years prior to 1944 have been destroyed, under authorization, by the Service. Iaconi's returns for the years 1944 through 1950 were located by the Service. According to the records of the Service, returns filed by Iaconi for the years 1934-1944, inclusive, reported income taxes due in the amounts shown in the following schedule. According to records of the Service, Mary did not file any individual income tax returns for the years 1920-1936, inclusive, but she filed returns for the years 1937-1944, inclusive, in which taxes were reported in the amounts shown in the following schedule: Iaconi's Re-
Mary's Re-
turns, Income
turns, Income
Year
Tax Reported
Tax Reported
1934
$ 21.48
No return
1935
0
No return
1936
62.92
No return
1937
187.91
$ 178.22
1938
83.37
48.56
1939
962.64
215.12
1940
3,502.18
349.27
1941
4,687.19
786.15
1942
14,114.86
1,697.34
1943
180.48
127.30
1944
538.00
865.71 For 1943, an income tax deficiency of $687.23 was assessed *252 against Iaconi, and $127.30 was refunded to Mary. Iaconi and his wife paid income taxes for the years 1920-1944, inclusive, in the aggregate amount of not less than $27,776.08. In his individual returns for 1945-1950, Iaconi reported total income and income taxes in the following amounts: Total Gross
Taxes
Year
Income Reported
Reported
1945
$ 7,749.61
$ 1,787.36
1946
12,350.00
2,995.35
1947
11,475.00
2,679.47
1948
12,159.67
2,552.21
1949
16,601.00
4,349.61
1950
5,650.00
872.28
$65,985.28
$15,236.28
He reported the sources of his income in each of the taxable years in the following manner: 1945, Central Wholesale Grocers, $3,120; income from ventures, $4,525; dividends and interest, $104.61; 1946, Central Wholesale Grocers, $5,200; income from various sources, $7,150; 1947, Central Wholesale Grocers, $3,975; income from various gains, $7,500; 1948, Central Wholesale Grocers, $3,900; income from various sources, $7,901; interest, $358.67; 1949, Central Wholesale Grocers, $3,900; income from various sources, $12,701; 1950, Central Wholesale Grocers, $5,650. Iaconi did not explain what was meant by any of the terms, "ventures," "various sources", and "various gains"; he did not give any breakdowns of income reported *253 under such terms; and he did not give any explanation of the amounts reported as dividends and interest. In her individual returns for 1945-1950, Mary reported total income and income taxes in the following amounts: Total Gross
Taxes
Year
Income Reported
Reported
1945
$ 7,462.44
$ 1,414.10
1946
11,075.90
2,371.02
1947
10,802.77
2,282.79
1948
$10,006.63
$ 1,617.83
1949
13,702.13
3,199.85
1950
15,762.57
3,988.11
$68,812.44
$14,873.70
In her returns, Mary reported as the sources of income and the respective amounts received therefrom as follows: East Side
Divs. and
Year
Salary
Rents
Interest
1945
$5,200
$2,172.74
$ 89.70
1946
7,800
2,987.49
288.41
1947
7,800
2,698.65
304.12
1948
7,950
1,588.56
468.17
1949
7,800
5,389.63
512.50
1950
7,800
6,570.13
1,392.44
Iaconi did not maintain any records of his income at any time or for any year, and he did not keep any records of whatever cash he may have had, which was not deposited in any bank account, in any year. The respondent's agents found what they believed were Iaconi's expenditures in each of the taxable years which were in total amounts in excess of the income for each year which he reported in his returns. Respondent therefore reconstructed Iaconi's taxable income for each of the taxable *254 years by the increase in net worth plus nondeductible expenditures method, and determined that there was unreported income for each year. Upon trial, the respondent corrected his net worth statement and made various adjustments, so that he tabulated and made a revised net worth statement. It is referred to in detail hereinafter. By his revised net worth statement, the respondent determined that for each year Iaconi realized income which he failed to report in the following amounts: Determined to Be
Year
Unreported Income
1945
$ 32,344.57
1946
39,565.79
1947
68,258.11
1948
121,003.08
1949
119,617.27
1950
50,254.26
$431,043.08
In the original and revised net worth statement, the respondent did not include in assets of any year or in the opening year (1944) of the net worth analysis any amount for undeposited or hidden cash. In his net worth statements, respondent included in assets, properties held in the name of Mary Iaconi which the petitioner contends were her assets, acquired by her with her own earnings and savings. The Eighteenth Amendment to the Constitution became law January 16, 1920. It was repealed on December 5, 1933, by the Twenty-First Amendment. Mary testified: That soon after the end *255 of the first World War she began to make illegal liquor in her home and to sell such product; that 4 or 5 years later, in 1924 or 1925, Iaconi left his job in a butcher shop and engaged in such activities with her; and that such business was conducted on a cash basis, for which no books or records were kept. That she and Iaconi carried on such illegal business of making and selling bootleg liquor until the repeal of Prohibition in 1933. That she did not know what amount of money was realized from the illegal liquor business, and that she did not report income from such liquor business in any Federal income tax return. That her principal activity consisted of supervising the mixing of liquor at home, which was done at times in a washing machine. That she made deliveries at night to customers. That sales were made at home and away from home. Salvatore testified that Iaconi, between 1928 and 1932, operated about 4 stills; that he had visited the stills; that they were located in several towns (unnamed) outside of Worcester; that he had seen only men (unnamed) working at the stills. Salvatore testified further that he, himself, had worked in the cellar at home "day after day", helping *256 with the operations. Florence testified that between 1929 and 1933, when she was 6 to 10 years old, she helped at home in the liquor operations by gluing labels on whiskey bottles; by getting bottles of liquor for her mother to sell; and by occasionally making sales of liquor, herself, at home. She could not remember the selling prices of the liquor. The Iaconi children testified that they participated in the conduct of the bootleg liquor business, as a family enterprise, by washing and labeling bottles and by making sales to individuals who came to the Iaconi house, if their mother was not available. Mary testified that Iaconi's principal activity was supervising the operation of 4 stills, getting orders, and making deliveries; and that he occasionally mixed and processed liquor in the cellar and tested the alcohol to bring it to 190 proof. In 1928, the Iaconis took a 13-year old girl into their home to live with them and to help with the care of the children, Michelina (Mickey) Murgo. In 1939, Michelina was married. Her married name is Gentile. She is not related to the Iaconis. Michelina testified that she made sales of bootleg liquor to customers who came to the house, and that *257 the Iaconis sold liquor by the gallon or in other units. On April 24, 1934, Mary and Iaconi were charged with having possession on April 20, 1934, in Worcester, of unstamped distilled spirits and were brought before Edwin H. Crandall, a United States Commissioner. The complaint was made by a United States Attorney. A Worcester policeman, M. O'Brien, and a deputy collector of internal revenue, T. H. Murphy, testified in support of the complaint. On May 11, 1934, the Commissioner determined that there was probable cause for holding Mary, but Iaconi was discharged. Mary was held on bail of $2,500. In 1934, the Iaconis organized a Massachusetts corporation, East Side Package Store, Inc., which carried on a retail business of selling packaged liquor at 127 Shrewsbury Street, Worcester. Its authorized stock is 100 shares of common stock of a par value of $100 per share, of which 50 shares are outstanding. At all times material the stock has been held as follows: 45 shares in the name of Mary, and 5 shares in the name of Salvatore. Mary is the president. Since 1934 she has been employed continuously, and still is employed, by the corporation. At first she received a salary of $50 per week, *258 which was increased to $100 in or before 1945, and to $150 in 1946. East Side filed Federal income tax returns. In 1928 or 1929, Iaconi began operating lotteries known as Italian lottery and nigger pool. He operated the lotteries under the name of Pool Enterprises. The records of the district director for Massachusetts show that employment tax returns were filed and small amounts of employment taxes were paid from March 1, 1937, to March 31, 1943. In about 1932, or before, he began the operation of a slot machine business under the name of Worcester Novelty Company in Worcester. In 1935, he had in operation 40 or 50 slot machines. By 1943, he had in operation about 250 machines. Salvatore Iaconi worked in this business for his father, at first part-time and later full-time. After 1934, Salvatore was employed full-time as a supervisor. There were 3 other employees until 1943, at least. The slot machine business was conducted on a cash basis. It was carried on in the following way: The slot machines were placed in inconspicuous and secluded locations in hotels, clubs, bowling alleys, cafes, and miscellaneous eating places. The machines were operated with nickels, dimes, and quarters. *259 At times, such machines pay out coins to the player. Iaconi retained the net receipts of the machines after making payments to the proprietor of the places where the machines were located. When the coins were taken out of the machines, Salvatore exchanged some of the proceeds at a bank for currency in denominations of $20, $50, and $100. He turned over currency to his mother, or put the money in a safe in the Iaconi house. Salvatore brought home money from the operations of the slot machines nearly every day beginning in 1935 until at least 1943. The records of the district director for Massachusetts show that employment tax returns were filed and a small amount of employment taxes was paid by Worcester Novelty Company between March 31, 1939, and March 31, 1943. Worcester Novelty Company had an office on Shrewsbury Street in Worcester, at first, and later at 12 Dublin Court. No bank account was maintained for this business, and no accounting records are available. Iaconi had other business interests. In 1932 or 1933, Iaconi entered into a wholesale beer business under the name of Worcester Beer Company. He bought 3.2 percent beer from breweries and distributed it to retailers. Iaconi's *260 interest in this business ended in about 1939. In about 1937, Iaconi invested money in a Chevrolet dealership known as Rex Motors, which sold new and used cars. He liquidated this business late in 1938. In 1937 or 1938, Iaconi invested money in Papalia Tobacco Company, which sold candy and tobacco at wholesale. Within about 1 year, he sold his interest back to Papalia, the original owner. In about 1939, in partnership with Frank Enos, Iaconi began the operation of an amusement arcade at Atlantic Beach, Rhode Island. In the arcade were pinball machines, punching bags, and various amusement devices. Central Importers, Inc., was incorporated in Massachusetts, March 13, 1939. Its originally authorized capital was stock of 100 shares of no par common stock, which was increased to 600 shares in 1944. In 1945, its name was changed to Central Wholesale Grocers, Inc. It is referred to herein as Central. Central was engaged in the wholesale grocery business in Worcester, and it carried on that business during 1945-1950, first at 131 Shrewsbury Street, and later at 76 East Worcester Street. The incorporators and the number of shares subscribed were as follows: Rocco Matarazzo, 49 shares; Salvatore, *261 49 shares; and Florence U. Manasas, 2 shares. The original officers were Salvatore, president; Rose Matarazzo, vice-president and treasurer; and Florence Manasas, as clerk. During the period involved here, there were 101 shares outstanding which were held as follows: Mary Iaconi, 98 shares; Matarazzo, 2 shares; and Salvatore, 1 share. During the period involved, certain members of the Iaconi family were officers and employees. Iaconi was president in 1944 and thereafter. Between 1939 and April 1942, when he entered the military service, Angelo worked for Central. After his military service ended in January 1946, he resumed such work and became credit manager. Salvatore worked for Central in 1944 and thereafter. He gradually took over more responsibilities and by 1946, he was a manager of Central's business. After graduating from college in 1945, Florence worked as office manager until January 1950, when she was married. In 1949, there were 6 girls working under her. In 1947, a Massachusetts corporation was organized. It is called the J.A.B. Realty Co. It was organized to hold title to a piece of real estate, to construct a warehouse to be used by Central Wholesale Grocers, and to operate *262 the warehouse. Construction of the warehouse began in June 1947 and was completed in 1948. It is a one-story building constructed of cinder blocks with a red brick facing, having an area of 32,000 square feet. Iaconi's attorney was Nicholas Fusaro, a member of the law firm Fusaro and Fusaro, in Worcester. Fusaro handled a great deal of the arrangements made for the construction of the warehouse, including the handling of cash used for that purpose and the payment of construction bills. Fusaro deposited cash received from the Iaconis in his own bank account, which he drew upon in paying the construction bills with his own checks. Salvatore and Florence gave cash to Fusaro to pay the bills. Books for the J.A.B. corporation were opened in June 1947. References are made hereinafter to what is shown by entries made in its books. At some time after 1947, a checking account was opened in the name of J.A.B. Realty. Between October 27, 1942, and March 16, 1943, the then attorney general of Massachusetts, Bushnell, had several undercover investigators operating in the city of Worcester to obtain information about bookmaking, horsebetting, slot machines, and other forms of gambling. These investigators *263 were state police officers. They were unknown in Worcester. After search warrants had been obtained, Massachusetts state police operating under the attorney general's supervision conducted a raid in Worcester on March 16, 1943. About 50 state policemen took part in this raid. They raided about 15 gambling headquarters in the city. This raid was known as the Bushnell raid. Iaconi was arrested in the Bushnell raid as the operator of a lottery. In January 1943, Iaconi and 4 others were indicted on 4 counts in the Superior Court for the County of Worcester for the crimes of promoting and setting up a lottery for money and receiving money for false lottery tickets, and for conspiring with others to set up and promote a lottery for money in Worcester, on October 27, 1942, and thereafter. On June 9, 1943, during the trial, Iaconi pleaded guilty to the first count and nolo contendere to the others. On June 10, 1943, the Worcester County Superior Court imposed a fine of $4,000 and sentenced him to 2 years in the House of Correction at Worcester. However, the sentence was suspended and Iaconi was placed on probation for two years. One of the state policemen who took part in the Bushnell raid *264 was George Z. Pollard, who had a supervisory role in the raid. On July 19, 1943, Pollard was appointed a probation officer for the Superior Court of Worcester County and he was assigned to supervise Iaconi's probation. Pollard interviewed Iaconi at least twice a month. He did not receive any complaints of any kind about Iaconi's conduct during the period of probation. Pollard allowed Iaconi to visit Florida for his health during the winters of 1943-1944 and 1944-1945. Following his arrest and conviction in the Bushnell raid, Iaconi was not again arrested or tried for gambling activities. In September 1952, Iaconi was indicted on 5 counts by a grand jury for wilfully attempting to evade Federal income taxes under section 145(b), 1939 Code, by filing or causing to be filed false and fraudulent income tax returns for the 5 years 1946-1950, inclusive. A jury trial started on June 16, 1954. Before the presentation of the case was concluded, Iaconi, on July 8, 1954, pleaded guilty to tax evasion for 1948 (count 3) only. The United States attorney then moved for the dismissal of the other charges, and on August 19, 1954, the court dismissed the charges relating to 1946, 1947, 1949, and 1950, *265 fined Iaconi $7,500, and sentenced him to 15 months' imprisonment. Iaconi kept 3 safes in his house in Worcester. At some time before 1928, he acquired a small safe and kept it in a closet in Mary's bedroom where it was located at all times material, including the years here involved. Late in 1932 or early in 1933, he purchased a large safe 53 inches high, which rested on wheels. It was put in the basement and remained there until 1951, when it was moved to the East Side Package Store at 129 Shrewsbury Street. A third safe was acquired in 1934 which also was put in the basement where it remained at all times material. It is still there. It is a wall safe 10 inches high. Iaconi and his 2 sons installed the larger safe, with wheels, inside a closet against a basement wall, having a wooden door which was kept locked. The safe has 2 outside doors which have a combination lock. The safe is 37 inches wide and 30 inches deep. Inside the safe is a second door, made of steel plate, with a key lock. Behind the steel door is a compartment divided into one area with shelves and another area with a small door having another combination lock. The wall safe purchased in 1934 is 10 inches wide and *266 13 inches deep. Iaconi and his 2 sons set this safe in cement. They built a form out from a basement will into which cement was poured to make a platform on which the safe was set. Cement was poured around the safe to make a column containing the safe at the front. Wood siding and a wooden door were put around the column. The finished job appeared to be a small closet. The Iaconis kept cash and currency in their safes. On December 12, 1939, Iaconi and Mary borrowed from the Peoples Savings Bank in Worcester, $3,000 at 5 1/2 percent interest. Mary executed a mortgage deed on the real estate located at 21 Berkeley Street, Worcester, to the bank as security for the loan. With respect to this deed, Iaconi released all his interests to the bank. Interest was paid on the loan from December 12, 1939, to September 18, 1946, on which date the entire amount of principal was paid. This mortgage loan was payable on demand. On January 16, 1940, Mary borrowed from the Worcester County Institution for Savings in Worcester, $8,000 at 5 percent interest. The loan was secured by a mortgage on the property located on Shrewsbury Street in Worcester. Payments of principal and interest on this loan were *267 paid as follows: Date
Principal
Interest
April 16, 1940
$ 125.00
$100.00
July 17, 1940
125.00
98.44
October 15, 1940
125.00
96.88
January 16, 1941
250.00
95.31
April 14, 1941
250.00
92.19
May 12, 1941
396.00
0
June 12, 1941
300.00
0
July 15, 1941
125.00
84.05
August 15, 1941
1,100.00
0
October 17, 1941
3,147.69
72.62
January 13, 1942
125.00
26.13
March 31, 1942
1,050.00
21.77
April 30, 1942
475.00
0
July 29, 1942
125.00
6.00
October 17, 1942
125.00
3.74
January 15, 1943
125.00
1.95
April 28, 1943
31.31
0.38
Totals
$8,000.00
$699.46
On July 14, 1947, Iaconi and Mary borrowed from the Guaranty Bank & Trust Company in Worcester, $20,000 at 4 1/2 percent interest. The loan was secured by a mortgage, executed by Mary alone, on the real estate located at 129-131 Shrewsbury Street in Worcester. Iaconi, as husband, released his interests. Payments of principal and interest on this loan were paid by Iaconi as follows: Date
Principal
Interest
October 22, 1947
$ 500.00
$ 225.00
December 29, 1947
1,050.00
0
January 15, 1948
500.00
217.25
April 15, 1948
500.00
201.94
July 14, 1948
603.69
196.31
August 12, 1948
750.00
0
August 13, 1948
350.00
0
October 15, 1948
569.42
180.58
November 26, 1948
750.00
0
January 4, 1949
700.00
0
January 21, 1949
635.09
164.91
February 15, 1949
8,500.00
0
July 21, 1949
2,166.94
133.06
September 15, 1949
1,000.00
0
September 30, 1949
400.00
0
October 5, 1949
350.00
0
October 21, 1949
674.86
23.15
Totals
$20,000.00
$1,342.20
According *268 to the records of the Massachusetts district director of internal revenue, during the period 1932 to 1950, inclusive, Iaconi and Mary neither transferred nor received any property by way of gift. They did not receive, individually, any inheritances of property or money. During the taxable years here involved, and for a considerable period before, Iaconi and Mary were represented by Nicholas Fusaro, referred to above, in a number of transactions involved here, including the purchase and sale of parcels of real estate and the incorporation of J.A.B. Realty Co. The petitioner did not request or subpoena Fusaro to appear and testify at the trial of these cases, and he neither appeared nor testified. Central Wholesale Grocers, Inc.: During 1939, the following amounts were invested in the capital stock of Central (referred to above), totalling $7,950, as follows: March 31
$2,000
April 12
450
April 27
1,500
May 12
1,000
July 7
2,000
September 8
1,000
$7,950
During 1939 to 1944, inclusive, Iaconi loaned Central $33,500.25. On December 31, 1944, $32,050 of the $33,500.25 loaned by Iaconi to Central was transferred from the loans payable account on the books of Central to its capital stock account. The difference *269 of $1,450.25 was repaid to Iaconi on December 30, 1944. This transfer was made "to record the issue of 150 shares of no par common stock in cancellation of the above liability". The books of Central do not record the issuance of any stock certificates on or about December 31, 1944. Iaconi's investment in Central as of December 31, 1944, amounted to $40,000. It was not diminished during the years here involved. Prior to December 31, 1944, Iaconi had contributed to the paid-in surplus of Central the amount of $30,071.52. After payment on April 1945 of $1,000 to Rocco Matarazzo, debited to paid-in surplus, the balance was $29,071.52. This investment by Iaconi in Central was not diminished during the period here involved. On October 31, 1945, Iaconi loaned Central $5,000. On July 31, 1946, the $5,000 was transferred from the loans payable account on the books of Central to the paid-in surplus account. This investment by Iaconi remained undiminished as of December 31, 1950. On December 31, 1945, there was accrued salary owing to Iaconi from Central in the amount of $1,200. This was paid to Iaconi by a check drawn on Central on May 17, 1946. Iaconi then loaned to Central the $1,200, and *270 on July 31, 1946, the loan was transferred from the loans payable account on the books of Central to the paid-in surplus account. This investment by Iaconi remained undiminished as of December 31, 1950. On July 1946 Iaconi gave a deposit of $800 to the George Motor Company on account of a car purchased by Central. This was recorded as an amount payable to Iaconi on Central's books. Central had previously made a payment of $489.95 on May 27, 1946, on behalf of Iaconi, so that as of July 31, 1946, Central was obligated to Iaconi in the amount of $310.05. On August 28, 1946, Iaconi loaned Central $5,000, so that as of December 31, 1946, Central owed Iaconi $5,310.05. On July 31, 1947, an amount of $2,184.85 was owing to Iaconi by Central on account of a balance in the exchange account. The aggregate obligation of Central to Iaconi as described above, in the amount of $7,494.90 was charged off the "Frank Iaconi" account to paid-in surplus on July 31, 1947. This investment by Iaconi in Central remained undiminished as of December 31, 1950. During the year 1948, Iaconi advanced to Central $4,907.25. This amount had not been repaid to Iaconi as of December 31, 1950. On July 29, 1948, Iaconi *271 borrowed from the Mechanics National Bank in Worcester, the sum of $65,000, at 2 1/2 percent interest, secured by John Hancock Mutual Life Insurance Company Annuity Contracts Nos. 0136619, 064492, 0174044, 071305 and 0156717. The balance of principal and interest due on this loan as of December 31, 1948, was $65,671.67. Thereafter, the balances of principal due on December 31, 1949, and December 31, 1950, were $65,000, and $54,500, respectively. The reduction in 1950 of the balance due to a payment to the bank of $10,500 by Fusaro and Fusaro, and contract No. 064492, was released. Interest on above loan was paid as follows: January 31, 1949
$671.67 (Charged to Cen-
tral Account)
August 1, 1949
821.52 (Charged to Cen-
tral Account)
February 1, 1950
830.56 (Cash)
August 1, 1950
817.02 (Cash)
The $65,000 borrowed by Iaconi from the Mechanics National Bank was credited to the account of Central at the bank. The $65,000 was contributed by Iaconi to the paid-in surplus of Central on July 31, 1948, and this investment remained undiminished during the period here involved. On September 16, 1948, according to the records of the Mechanics National Bank, Mary borrowed $59,000 at 2 1/2 percent interest *272 secured by John Hancock Mutual Life Insurance Company Annuity Contracts Nos. 064940, 0136621, 016146 and 0174045. The balances of principal due on the loan were as follows: December 31, 1948
$59,000
December 31, 1949
59,000
December 31, 1950
37,500 Interest on above loan was paid as follows: March 16, 1949
$667.44 (Check, First Nation-
al Bank, Miami)
September 18, 1949
753.89 (Charged to Central)
March 16, 1950
741.60 (Cash)
September 18, 1950
479.89 (Cash) Although this loan was made by the Mechanics National Bank, in the name of Mary, the actual borrower was Iaconi. On October 31, 1948, the $59,000 which had been borrowed from the Mechanics National Bank was contributed to the paid-in surplus of Central. This contribution was recorded in Central's books as having been made by Iaconi. This investment remained undiminished as of December 31, 1950. On July 31, 1948, Iaconi contributed $3,500, previously loaned to Central, to the paid-in surplus of Central. This amount was transferred on that date from the loans payable account to the paid-in surplus account. On July 31, 1947, there was accrued salary due Iaconi from Central in the amount of $2,566.50. On the same day Central gave a note to Iaconi *273 in that amount and it was transferred to the notes payable account on its books. Also, on the same day, the same amount was contributed by Iaconi to the paid-in surplus of Central. On August 19, 1947, a check in the amount of $2,566.50 was issued by Central to Iaconi. Iaconi returned this amount to Central, and it was then credited to the Iaconi account on the books of Central. On July 31, 1948, the Iaconi account was debited in the amount of $2,566.50, and the salary of officers account credited, returning the $2,566.50 to the paid-in surplus of Central. This investment by Iaconi in Central remained undiminished as of December 31, 1950. During the years 1945-1950, inclusive, the general ledger of Central contained an Exchange Account. This account was used by Iaconi as a conduit through which his personal expenses were paid with the checks of Central. J.A.B. Realty Co.: J.A.B. Realty Co., Inc., referred to above, was incorporated by Fusaro, attorney for Iaconi, for the purpose of constructing and operating the warehouse building at 76 East Worcester Street in Worcester, which was used by Central Wholesale Grocers. J.A.B. Realty did not file income tax returns prior to its fiscal year *274 ending on September 30, 1952. The only books and records kept for J.A.B. consist of one binder containing cash receipts, cash disbursements, general ledger, and general journal. J.A.B. did not have a stock certificate book, and no stock certificates were ever issued. On June 16, 1947 Iaconi transferred to J.A.B., real estate owned by him and held in the name of Mary in consideration for capital stock of J.A.B. in the amount of $15,000. This investment by Iaconi in the capital stock of J.A.B. was not diminished during the period here involved. On July 18, 1947 Iaconi invested in the capital stock of J.A.B. the amount of $20,000. The $20,000 was borrowed from the Guaranty Bank & Trust Company in Worcester on July 14, 1947. On September 29, 1947 there was an additional $13,000 invested in the capital stock of J.A.B. by Iaconi. The $13,000 was borrowed from East Side Package Store in the name of Mary Iaconi. On September 29, 1947 there was an additional $8,000 invested in the capital stock of J.A.B. by Iaconi. The $8,000 was withdrawn from Account No. XXX,640 at the Worcester County Institution for Savings. The withdrawal was represented by teller's check No. 135,139 drawn on that bank, *275 payable to J.A.B. Realty Co., Inc., and endorsed, "J.A.B. Realty Co" by Jacqueline Cambrio. On November 7, 1947 there was an additional $8,000 invested by Iaconi in the capital stock of J.A.B. The $8,000 was withdrawn from Account No. XXX,201 at the Peoples Savings Bank in Worcester. The withdrawal was represented by teller's check No. 49,301 drawn on the bank payable to J.A.B. Realty Co., Inc., and endorsed "J.A.B. Realty Co., Inc." by Jacqueline Cambrio, Treasurer. On December 9, 1947, December 15, 1947, and December 29, 1947, additional investments in the amounts of $10,000, $5,000, and $5,000, respectively, were made by Iaconi in the capital stock of J.A.B. These amounts were delivered in cash to the offices of Fusaro & Fusaro by Mary or one of the Iaconi children and were deposited in a bank account of Fusaro & Fusaro in the Guaranty Bank & Trust Company, and later were transferred from that account to J.A.B. At the end of 1947, Iaconi's total investment in the capital stock of J.A.B. was $69,000. During the year 1948, Iaconi invested $65,500 in the capital stock of J.A.B., as follows, increasing his investment to $134,500: Date
Amount
1/ 7/48
$ 5,000
1/23/48
5,000
2/ 2/48
10,000
2/ 6/48
5,000
2/12/48
5,000
2/18/48
4,500
3/ 5/48
5,000
4/14/48
5,000
4/15/48
7,000
4/22/48
5,000
5/12/48
9,000
$65,500
*276 Each of the above payments was delivered in cash to the offices of Fusaro & Fusaro by Mary or one of the Iaconi children, was deposited by Fusaro & Fusaro in their account in the Guaranty Bank & Trust Company, and subsequently the total amount was transferred to J.A.B. On November 2, 1949 there was an additional investment of $3,800 by Iaconi in the capital stock of J.A.B., which increased his investment to $138,300. All of the amounts of money referred to above were delivered to the offices of Fusaro & Fusaro in envelopes on which were written fictitious names. Although each of the investments by Iaconi in J.A.B., referred to above, was entered on the books of J.A.B. as an investment of Mary, the funds used belonged to Iaconi. The investments [of] Iaconi in J.A.B. remained undiminished as of December 31, 1950, on which date his total investment was $138,300. East Side Package Store, Inc.: East Side Package Store, Inc., was organized in 1934 under Massachusetts law by the Iaconis. It engaged in the business of buying, selling, and dealing in alcoholic liquors. It filed corporation income tax returns with the director for the district of Massachusetts Its authorized capital stock is *277 100 shares, par value $100 per share, of which 50 shares are outstanding. At all times material the stock was held in the names of Mary, 45 shares, and Salvatore, 5 shares. The books and records of East Side consist of one binder, containing cash receipts, check disbursements, a general journal, and a general ledger for the years 1946-1950, inclusive, payroll records for the years 1946 and 1947, and a loose-leaf notebook containing minutes of meetings and a stockholders' ledger. There are no other books and records of East Side available. As of December 31 of 1944-1950, inclusive, $5,000 was invested in the capital stock of East Side, and this investment remained undiminished as of the end of 1950. The books of East Side contain a notes payable account and a loans payable account. As of December 31, 1944 the balance in the notes payable account was $8,750, on account of advances previously made by East Side. On December 31, 1946, $964.78 of the above amount was transferred from the notes payable account to the loans payable account, leaving a balance on December 31, 1946, of $7,785.22. On December 31, 1947, this account was closed by a credit to the loans receivable account. On December *278 31, 1945, in East Side's loans payable account was the amount of $9,035.22. During 1946 this amount was paid by East Side. During 1946, Iaconi purchased a truck for East Side for $1,300, which amount remained unpaid as of the end of 1946 and is shown as a loan payable in East Side's books. Before December 31, 1947, the credit balance in the notes payable account of $7,785.22, and the credit balance of $1,300 in the loans payable account were eliminated by transfers to another account. The total of these 2 items, $9,085.22, was credited to another account, "Loans Receivable from Mary Iaconi." On December 19, 1950, Iaconi advanced to East Side the sum of $10,000, and at the end of 1950, that amount appeared in East Side's loans payable account as a debt of East Side. That amount remained unpaid at the end of 1950. On September 26, 1947, East Side loaned to Iaconi $13,000. Iaconi invested this sum in J.A.B. Realty. On December 31, 1947, $9,085.22 of this amount was repaid by crediting the loans receivable account in the name of Mary with $9,085.22, and by debiting the loans payable and notes payable accounts, respectively, with the amounts of $1,300 and $7,785.22, leaving a balance due *279 to East Side by Iaconi as of December 31, 1947, in the amount of $3,914.78. The balances due in the loans receivable account at the end of 1947, 1948, 1949, and 1950 were $3,914.78, $4,422.86, $5,232.86, and $6,983.52, respectively, which amounts were owed to East Side by Iaconi. The Cosmopolitan Finance Company: Cosmopolitan Finance Company is a Massachusetts corporation which was organized in 1938 for the purpose of engaging in the loan business. On April 15, 1939, 100 shares of common stock, par value $100 per share, were issued in the name of Mary for which $10,000 in currency was paid from Iaconi's funds. On February 26, 1943, this corporation was dissolved. On August 15, 1947, a check for $5,000 payable to Chester Iaconi was drawn on the account of Cosimo J. Toscano, former treasurer and director of Cosmopolitan. The payment was in redemption of the 100 shares of stock. Real Estate: On January 4, 1939, Iaconi purchased, from Patrick A. Collins, a lot in Westerly, Rhode Island. On April 15, 1941, he purchased an adjoining lot from Julia T. Purtill. Although titles to the lots were taken in the names of Iaconi and Mary, the funds with which the lots were purchased were those of *280 Iaconi. At some time prior to December 31, 1944, Iaconi erected a summer home on these lots. On April 3, 1945, on September 11, 1946, Iaconi purchased other adjoining lots in Westerly from Samuel H. Davis and Alice T. Prout, respectively. Although titles to the lots were taken in the names of Iaconi and Mary, the funds with which the lots were purchased were those of Iaconi. The total cost bases of the improved real estate referred [to] above on December 31 of each of the years 1944-1950 were as follows: 1944
$20,400
1945
21,400
1946
22,400
1947
22,400
1948
22,400
1949
22,400
1950
22,400
On March 5, 1937, Iaconi purchased from Paul and Margaret Pipping, real estate located in Millbury, Massachusetts. Title was taken in the name of Mary. The real estate was purchased with the funds of Iaconi. The values at cost of the Millbury real estate, less allowable depreciation, at the end of 1944-1950, were as follows: 1944
$2,200
1945
2,110
1946
2,020
1947
1,930
1948
1,840
1949
1,750
1950
1,660
On March 5, 1925, Iaconi purchased the lot at 21 Berkeley Street in Worcester from Angelo B. Oliva. Title to the property was taken in the names of Iaconi and Mary The real estate was purchased with funds of Iaconi. Iaconi constructed *281 a home on the Berkeley Street lot in 1927 or 1928. The total cost of this improved real estate was $7,500. On December 15, 1927, the Berkeley Street real estate was deeded by Iaconi and Mary to Agnes Griffin, a bookkeeper in the office of Fusaro, and on the same day it was deeded back to Mary, individually. On April 24, 1934, the Berkeley Street real estate was deeded by Mary to Regina Luperelli, her sister, and on September 23, 1936, the real estate was deeded back to Mary, individually. The above transfers were not bona fide sales of the property; they represented protective transfers of title to avoid possible seizure of the property. On January 8, 1940, November 27, 1941, and December 17, 1943, Iaconi purchased real estate at 129-131 Shrewsbury Street in Worcester. Although title to this property was taken in the name of Mary, it was purchased with funds of Iaconi. During 1946, improvements costing $2,000 were made on this property. The cost basis of this property, less allowable depreciation, as of the end of each of the years 1944-1950 was as follows: 1944
$14,256.49
1945
13,721.88
1946
15,187.27
1947
14,652.68
1948
14,118.05
1949
13,583.44
1950
13,048.83 On September 18, 1944, Iaconi purchased *282 property at 76 East Worcester Street in Worcester. Title was taken in the name of Agnes Griffin in Fusaro's office. It was purchased with the funds of Iaconi. On June 16, 1947, the property was transferred to J.A.B. The cost of the property was $15,000. On February 13, 1945, Iaconi purchased real estate in Dade County, Florida. Title was taken in the name of "Josthino" Iaconi, which was an incorrect version of Mary's name. The property was purchased with funds of Iaconi. The cost was $3,250. On May 26, 1950, the property was sold by Iaconi and his wife to Jacob Marcus. On February 14, 1948, Iaconi purchased real estate located at 7921 Noremac Avenue in Miami Beach. Title was taken in the names of Florence M. Iaconi and Carolina V. Iaconi, the daughters of Iaconi. The property was purchased with funds of Iaconi. The total purchase price was $28,413.82. The Noremac Avenue property was subject to a mortgage held by the Metropolitan Life Insurance Company. The balance of principal and interest due on the mortgage on February 18, 1948, was $14,250.53. The balances due on the mortgage at the end of the years 1948-1950 were as follows: 1948
$13,523.55
1949
12,465.75
1950
3,189.76 The interest *283 payments on the mortgage were as follows: 1948
$556.50
1949
782.20
1950
191.92 The payments of principal and interest on the mortgage were paid with funds of Iaconi. On February 18, 1948, Iaconi gave a second mortgage on the Noremac Avenue property in the amount of $8,000 to Vincent J. Lombardi. Savings Bonds: Prior to December 31, 1944, Iaconi purchased United States Savings Bonds, Series E, F and G, having total cash value of $15,325. These bonds were held during the years 1944-1950, inclusive. The savings bonds were issued in the names of Florence Iaconi, Carolina Iaconi, Mary J. Iaconi, Mary Josephine Iaconi, and in the joint names of Mary and Frank Iaconi. The bonds were purchased with funds of Iaconi. Insurance Policies: On October 21, 1929, the Prudential Life Insurance Company issued to Iaconi, as owner, industrial policies Nos. 79945893 and 79945894, in the face amount of $507, each. The premium payable on each policy was 65 cents a week from the date of issue to November 17, 1949. On that date, Prudential redeemed the policies by issuing to Iaconi 2 checks, each for $643.11. The investment by Iaconi in these policies as of December 31 of each of the years here involved amounted *284 to the following: Policy No.
1944
1945
1946
1947
1948
79945893
$513.50
$547.30
$581.10
$614.90
$648.70
79945894
513.50
547.30
581.10
614.90
648.70
On July 28, 1930, Prudential issued to Iaconi, as owner, industrial endowment policy No. 83276182. The face value of the policy was $468. The premium payable on this policy was 60 cents a week from the date of issue to July 28, 1950 when Prudential redeemed the policy by issuing to Iaconi a check for $580.80. The cash investment of Iaconi in this policy at the end of 1944-1949 amounted to: 1944
$450.00
1945
481.20
1946
512.40
1947
543.60
1948
574.80
1949
606.00
On October 28, 1929, Prudential issued to Mary two 20-year endowment policies Nos. 80008457 and 80008458 in the face value of $480, each. Premiums payable on each policy were 60 cents a week from the date of issue to November 17, 1949, when Prudential redeemed these 2 policies by issuing 2 checks to Mary, each in the amount of $680.16. The premiums on these policies were paid by Iaconi, and his cash investments in the policies as of December 31 of each of the years here involved were as follows: Policy No.
1944
1945
1946
1947
1948
80008457
$474.00
$505.20
$536.40
$567.60
$598.80
80008458
474.00
505.20
536.40
567.60
598.80
On July *285 28, 1930, Prudential issued to Mary a 20-year endowment policy No. 83276179 having a face value of $480. The premiums were 60 cents a week from the date of issue to July 28, 1950, when Prudential redeemed the policy by issuing to Mary a check for $595.68. The premiums on this policy were paid by Iaconi. His cash investment in this policy as of December 31 of each of the years here involved was as follows: 1944
$450.00
1945
481.20
1946
512.40
1947
543.60
1948
574.80
1949
606.00
On October 10, 1929, John Hancock Mutual Life Insurance Company (hereinafter referred to as John Hancock) issued to Iaconi, as owner, two 20-year endowment policies Nos. 19975367 and 19975368. The face value of each was $400. The premium payable on each was 50 cents a week from the date of issue to December 16, 1948. On November 22, 1949, John Hancock redeemed these policies by issuing to Iaconi 2 checks, each for $477. Iaconi's cash investment in above policies as of the end of each of the years here involved was as follows: Policy No.
1944
1945
1946
1947
1948
19975367
$397.50
$423.50
$449.50
$475.50
$501.50
19975368
397.50
423.50
449.50
475.50
501.50
On July 28, 1934, the New York Life Insurance Company issued to Iaconi as owner, an annuity *286 contract, without any fixed annual premium, but for single premiums of not less than $100, each. Premium payments made under this contract were as follows: Date
Amount
July 28, 1934
$ 500.00
July 16, 1935
500.00
August 31, 1935
500.00
November 19, 1935
492.30
August 18, 1936
2,000.00
October 8, 1936
500.00
July 20, 1937
2,000.00
December 31, 1938
4,000.00
$10,492.30 By December 31, 1938, the contract was paid in full. The insurance company had made no payments under this contract to Iaconi or any other person up to December 31, 1950, and it was an asset of Iaconi in the amount of $10,492.30 at the end of each of the years here involved. Annuity Contracts: On October 11, 1940, John Hancock issued to Iaconi, as owner, annuity contract No. 064492, wherein Iaconi was the annuitant and Mary was the beneficiary. The policy called for 10 annual premiums of $1,000 each to be discounted if paid in advance, payable in October of each year between 1941 and 1949, inclusive. The total premiums paid on this contract as of June 2, 1941, amounted to $9,049.35, which amount was the value of this contract at the end of each of the years involved here. On August 4, 1941, John Hancock issued to Iaconi, as the owner, annuity *287 contract No. 071305, wherein Iaconi was the annuitant and Mary was the beneficiary. This policy called for 14 annual premiums of $1,000 each, to be discounted if paid in advance, payable in August of each year between 1941 and 1954, inclusive. The premiums paid were as follows: Date
Amount
8/ 6/41
$ 1,000.00
2/ 9/42
1,975.60
8/21/42
2,786.40
1/12/43
2,619.48
8/14/44
887.90
9/ 6/45
2,612.00
3/20/46
849.32
$12,730.70 The values of this contract at the end of 1944 and 1945 were $9,269.38 and $11,881.38; and the value at the end of each of the years 1946-1950 was $12,730.70. On May 2, 1946, John Hancock issued to Iaconi, as owner and holder, annuity contract No. 0132447, wherein Florence M. Iaconi was the annuitant and Carolina V. Iaconi was the beneficiary for purposes of any death benefit. The policy called for 27 annual premiums of $1,000, payable in May of each year between 1946 and 1972, discounted if paid in advance. The policy recited that Florence was 23 years old in 1946 and that retirement payments would begin when she reached 50. The premiums paid were as follows: Date
Amount
7/ 5/46
$1,000.00
8/27/46
1,000.00
3/12/47
1,941.60
6/29/48
965.99
7/19/48
947.07
8/ 8/49
1,875.52
5/13/50
1,838.67 The values of this *288 contract at the end of 1946-1950 were $2,000, $3,941.60, $5,854.66, $7,730.18, and $9,568.85. As of July 5, 1946, Tony Santello of Shrewsbury owed Iaconi $10,000. Pursuant to instruction from Iaconi, Santello paid $10,000 to Florence, and Florence used the money to pay the premium payments in cash on the above annuity contract. On August 7, 1946, John Hancock issued to Iaconi, as owner and holder, annuity contract No. 0136619, wherein Iaconi was the annuitant, Mary was the beneficiary for purposes of the death benefit, and on her death their children were successive beneficiaries. This contract called for 14 annual premiums of $1,000 payable in August 1946-1959. On August 9, 1946, a premium payment of $14,818.08 was paid this contract, and no more was paid during the years involved. On July 10, 1947, John Hancock issued to Iaconi, as owner, annuity contract No. 0156717, wherein Iaconi was the annuitant and the beneficiaries were as follows: "Mary Iaconi, wife, if living, otherwise Angelo, Salvatore, Florence M. and Carolina V. Iaconi, children, equally or to the survivors or survivor." The contract called for 13 annual premiums of $1,500 each, payable in August of each year between *289 1947 and 1959, inclusive. Premiums were paid as follows: Date
Amount
7/22/47
$1,500.00
7/22/47
9,708.00
8/30/47
6,185.81 The values of this contract at the end of 1947-1950, were as follows: $17,393.81, for each year. On April 28, 1948, John Hancock issued to Iaconi, as owner, annuity contract No. 0174044, wherein Iaconi was the annuitant and the beneficiaries were as follows: "Mary Iaconi, wife, if living, otherwise Florence M. and Carolina V. Iaconi, daughters, equally or the survivor." The contract called for 12 annual premiums of $1,000 each, payable in April of each year between 1948 and 1959, inclusive. Premiums were paid as follows: Date
Amount
5/20/48
$1,000.00
5/10/48
9,786.80 The value of this contract at the end of 1949 and 1950 was $10,786.80. On July 14, 1949, John Hancock issued to Iaconi, as owner, annuity contract No. 0198855, wherein Iaconi was the annuitant and the beneficiaries were as follows: "Mary Iaconi, wife, if living, otherwise Florence M. Iaconi, Carolina V. Moretti, daughters, equally, or to the survivor." Premiums were paid as follows: Date
Amount
7/25/49
$ 4,700.00
8/ 5/49
9,125.52
9/ 7/49
13,092.97
12/ 9/49
12,398.24
4/17/50
7,905.01 The values of this contract at the end of *290 1949 and 1950 were $39,316.73 and $47,221.74, respectively. On July 21, 1948, an "Agreement of Life Insurance Policy as Collateral" was executed by Iaconi with respect to policy No. 071305, assigning the policy to The Mechanics National Bank of Worcester. Similar agreements were executed by him on July 21, 1948, with respect to annuity contracts Nos. 064492, 0174044, 0156717, and 0136619. On November 1, 1940, John Hancock issued to Mary annuity contract No. 064940, wherein Mary was the annuitant/and the beneficiary was Iaconi. The contract called for 10 annual premiums of $1,000, which were paid as follows: Date
Amount
11/14/40
$1,000.00
7/ 7/41
1,000.00
7/ 7/41
969.55
10/23/42
975.60
2/24/43
2,803.74
11/10/44
942.30
7/23/45
937.68
9/ 6/45
919.27 The value of this contract at the end of 1944 was $7,691.19; and at the end of each year, 1945-1950, it was $9,548.14. On May 2, 1946, John Hancock issued to Mary annuity contract No. 0132448, wherein Carolina was the annuitant and her sister, Florence, was the beneficiary. The contract called for annual premiums of $1,000, which were paid as follows: Date
Amount
7/ 5/46
$1,000.00
11/ 4/46
1,000.00
9/29/47
2,922.38
7/ 7/48
947.07
8/ 8/49
1,875.52
5/31/50
1,838.67 The values *291 of this contract at the end of 1946-1950, were, respectively, $2,000, $4,922.38, $5,869.45, $7,744.97, and $9,583.64. Carolina (Iaconi) Moretti, the annuitant on policy No. 0132448, did not pay any of the premiums on that contract. On August 7, 1946, John Hancock issued to Mary annuity contract No. 0136621, wherein Mary was the annuitant and the beneficiary was Iaconi. This contract called for 10 annual premiums of $1,100. Payments were made on August 9, 1946, in the amounts of $1,100, and $9,880.86, or a total of $10,980.86. The value of this contract at the end of each of the years 1946-1950 was $10,980.86. On September 3, 1947, John Hancock issued to Mary annuity contract No. 0160146, wherein Mary was the annuitant and the beneficiary was Iaconi, if living, otherwise the Iaconi children. The contract called for 10 annual premium payments of $3,000, which were paid as follows: Date
Amount
9/ 5/47
$ 3,000.00
9/ 5/47
24,486.60
$27,486.60 The value of this contract at the end of the years 1947-1950 was $27,486.60. On April 28, 1948, John Hancock issued to Mary annuity contract No. 0174045, wherein Mary was the annuitant and the beneficiary was Iaconi, if living, otherwise Carolina V. and *292 Florence M. Iaconi, equally, or the survivor. The contract called for 14 annual premiums of $1,000, which were paid as follows: Date
Amount
4/28/48
$ 1,000.00
4/28/48
11,348.40
$12,348.40 The value of this contract at the end of 1949 and 1950 was $12,348.40. On July 14, 1949, John Hancock issued to Mary annuity contract No. 0198856, wherein Mary was the annuitant and the beneficiary was Iaconi, if living, otherwise Florence M. and Carolina V. Iaconi, equally, or the survivor. The contract called for 13 annual premiums of $4,700, which were paid as follows: Date
Amount
7/25/49
$ 4,700.00
8/ 5/49
9,125.52
9/ 7/49
13,092.97
12/ 9/49
12,398.24
4/ 7/50
15,503.22
$54,819.95 The value of this contract at the end of 1949 and 1950 was $39,316.73 and $54,819.95, respectively. On July 27, 1948, an "Agreement of Life Insurance as Collateral" was executed by Iaconi with respect to annuity contracts Nos. 064940, 0136621, 0160146, and 0174045, assigning the contracts to the Mechanics National Bank of Worcester. As of December 31, 1950, no payments had been made by John Hancock to Iaconi, Mary, or any other person on any of the annuity contracts referred to above. Sylvester M. Murano, of Misquamicut, Rhode Island, *293 during the period here involved, was the district manager of John Hancock, and his office was at 30 Collins Street, Meriden, Connecticut. The John Hancock annuity contracts were all purchased through Murano and all payments of premiums on the annuity contracts were made to him. The premium payments on all of the John Hancock annuity contracts, except contract No. 132447, were transmitted to Murano in currency wrapped in paper bags by either Iaconi or Mary. The currency to pay the premiums on the annuity contracts was generally in denominations of less than $50. Occasionally there was included currency in the denomination of $50. The payments were never made with currency in denominations of $50over. All of the premium payments on the John Hancock annuity contracts were made with the funds of Iaconi. Savings and Bank Accounts: The records of the Peoples Savings Bank in Worcester show that there was a savings account, No. XX5201, in the names of Mary J. Iaconi, or Frank Iaconi, payable to either or the survivor. The balances in account at the end of the years 1944-1950 were as follows: 1944
$4,766.39
1945
8,266.28
1946
8,427.71
1947
597.09
1948
609.09
1949
4,224.50
1950
821.78
The records of the Worcester *294 County Institution for Savings in Worcester, disclose a savings account, No. XX5640, in the names of Mary J. Iaconi or Frank Iaconi, payable to either or the survivor. The balances in this account as of the end of 1944-1950, were as set forth below: 1944
$1,354.88
1945
2,382.10
1946
5,764.74
1947
826.82
1948
843.43
1949
860.37
1950
2,138.50
The records of the Miami Beach First National Bank in Miami Beach disclose that a joint account in the names of Frank or Mary Iaconi was opened on February 28, 1945, with a deposit of $2,500. The balances in this account at the end of 1945-1950 were as follows: 1945
$3,861.76
1946
3,139.84
1947
2,032.54
1948
3,883.64
1949
843.51
1950
852.18
There was a bank account in the Worcester County Trust Company, an individual checking account in the name of Mary on which she alone was authorized to draw checks. The balances in this account at the end of each of the years 1944-1950, were as follows: 1944
$ 319.25
1945
1,032.36
1946
722.76
1947
877.96
1948
820.42
1949
4,711.84
1950
510.17
Funds deposited in all of the savings and bank accounts referred to above were the funds of Iaconi. Loans Made by Iaconi: Frank E. Luzzi, of Westerly, Rhode Island, borrowed $2,300 in currency from Iaconi in December *295 1942, which remained unrepaid on December 31, 1950. The borrower gave a mortgage to Mary on real estate to secure the loan. No interest was paid on the loan. Luzzi was employed by Iaconi as a gardener at Misquamicut each summer commencing in 1939 and throughout the years involved. He was paid $300 each summer. Edward P. Lallo, of Westerly, borrowed $1,000 in currency from Iaconi in 1947; he borrowed an additional $8,000 from Iaconi in 1948; and he borrowed an additional $3,000 in currency from Iaconi in 1949, a total sum of $12,000. On July 15, 1949, Lallo and Rose Lallo executed a mortgage on real estate to Mary to secure these loans. Prior to December 31, 1949, $3,500 of the loans had been repaid, and the balance of $8,500 was repaid in 1950 when the mortgage was discharged. The mortgage recited that interest payments of 6 percent, payable semi-annually in advance, as recorded in a negotiable promissory note of even date, but no interest was paid on the note. At the time Iaconi made the above loans to Lallo, Lallo was a police officer in the Town of Westerly. Iaconi had real and personal property put in Mary's name. On December 10, 1949, Iaconi loaned to Stanley M. and Edna Bailey, *296 the sum of $20,000, for which they gave a mortgage on property in Dade County, Florida, and a promissory note to Mary, to secure the loan. On October 27, 1950, Nicholas Fusaro, received a check for $20,000 from Edna Bailey in repayment of the loan, which was credited to Iaconi. Of that sum, $10,522.60 was paid to the Mechanics National Bank of Worcester, on October 2, 1950, on account of the loan made by the bank to Iaconi. During the taxable year 1944, Iaconi loaned to Lena Qualey the sum of $1,500 to purchase the Venice Restaurant, which was repaid to Iaconi during 1947. Safe Deposit Boxes: According to the records of the Worcester County Trust Company in Worcester, a safe deposit box was rented in the name of Mary or Frank Iaconi, on February 1, 1932. During the periods here involved, the only entries to the box were made by Mary, and were on the following dates: 8/19/46, 9/18/46, 12/13/46, 9/26/47, 4/22/48, 10/17/49 According to the records of the First National Bank of Miami, in Miami Beach, a safe deposit box, No. 2416, was rented in the name of Frank Iaconi, or Mary Iaconi, either or survivor, on January 17, 1946. On November 18, 1949, the name of Florence M. Iaconi was added. *297 During the years involved, the only entries to the box and the persons who made entry were as follows: Date
Person
1/18/46
Mary
2/11/46
Mary
2/26/46
Mary
12/30/46
Mary and Caroline
1/ 6/47
Mary
1/15/47
Mary
2/ 4/47
Mary
12/30/47
Mary
1/ 8/48
Mary and Florence
2/ 5/48
Mary
2/18/48
Mary
2/25/48
Mary
3/19/48
Mary
12/28/48
Mary
1/17/49
Mary
3/15/49
Mary
11/18/49
Florence
11/18/49
Mary
11/18/49
Iaconi
4/24/51
Florence
4/24/51
Mary According to the records of the North Shore Bank of Miami, a safe deposit box, No. 545, was rented in the name of Frank and Mary Iaconi, on January 6, 1949. During the years involved, the only entries to the box were by Mary, and they were on the following dates: 1/17/49, 2/ 9/49, 3/14/49, 11/22/49, 3/17/50, 12/29/50 Automobiles: During the taxable years, Iaconi purchased for his personal use Cadillac automobiles, the cost bases of which at the end of the years involved were as follows: 1944
$2,400.00
1945
2,800.00
1946
3,637.30
1947
3,395.00
1948
4,393.80
1949
4,687.70
1950
4,687.70
Living Expenses and Taxes: Iaconi paid all of the living expenses of himself and Mary, including the cost of the trips to Florida. On May 21, 1946, Iaconi paid the Sheraton Hotel, in Worcester, $3,536.25 which covered the charges of the *298 wedding reception for Angelo and his wife. During each of the years 1945-1950, inclusive, Iaconi incurred and paid personal living expenses of not less than the following amounts: 1945
$ 7,500
1946
12,000
1947
10,000
1948
10,000
1949
10,000
1950
10,000
During each of the years 1945-1950, inclusive, Iaconi paid income taxes in the following amounts: 1945
$1,718.24
1946
1,487.84
1947
5,097.00
1948
519.30
1949
4,470.08
1950
9,197.56
Upon the basis of some stipulations of facts and his interpretation of the evidence, the respondent has revised his original net worth analysis of Iaconi's increases in net worth plus nondeductible expenditures for the taxable years 1945-1950, as set forth below. The respondent made no allowance for any hidden, or invisible, cash on hand as of the end of any of the years covered by the net worth statement. Assets
12-31-44
12-31-45
12-31-46
12-31-47
Investments
$ 92,821.52
$106,856.74
$104,666.79
$171,766.42
Annuities
40,172.22
44,885.57
75,778.23
125,767.02
Real Estate
57,556.49
62,981.88
65,457.27
49,732.68
Mortgages and Loans Received
3,800.00
3,800.00
3,800.00
3,300.00
U.S. Government Bonds
15,325.00
15,325.00
15,325.00
15,325.00
Cash in Banks
6,440.52
14,542.50
18,055.05
4,334.41
Automobiles
2,400.00
2,800.00
3,637.30
3,395.00
Total Assets
$220,315.75
$251,191.69
$286,619.64
$373,620.53
Liabilities
Mortgages and Loans Payable
3,000.00
3,000.00
0
22,364.78
Net Worth (Dec. 31)
$217,315.75
$248,191.69
$286,619.64
351,255.75
Net Worth (Jan. 1)
217,315.75
248,191.69
286,619.64
Net Worth Increase
30,875.94
38,427.95
64,636.11
Add: Federal Income Tax Paid
1,718.24
1,487.84
5,097.00
Estimated Living Expenses
7,500.00
12,000.00
10,000.00
Adjusted Gross Income
$ 40,094.18
$ 51,915.79
$ 79,733.11
Corrected
Adjusted Gross Income Per
7,749.61
12,350.00
11,475.00
Returns
Additional Income
$ 32,344.57
$ 39,565.79
$ 68,258.11
*299 Assets
12-31-48
12-31-49
12-31-50
Investments
$372,240.17
$376,040.17
$386,040.17
Annuities
152,006.75
230,955.65
256,829.22
Real Estate
77,521.87
76,897.26
73,022.65
Mortgages and Loans Received
11,300.00
30,800.00
2,300.00
U.S. Government Bonds
15,325.00
15,325.00
15,325.00
Cash in Banks
6,156.58
10,640.22
4,322.63
Automobiles
4,393.80
4,687.70
4,687.70
Total Assets
$638,944.17
$745,346.00
$742,527.37
Liabilities
Mortgages and Loans Payable
165,044.97
149,698.61
110,173.28
Net Worth (Dec. 31)
$473,899.20
$595,647.39
$632,354.09
Net Worth (Jan. 1)
351,255.75
473,899.20
595,647.39
Net Worth Increase
$122,643.45
$121,748.19
$ 36,706.70
Add: Federal Income Tax Paid
519.30
4,470.08
9,197.56
Estimated Living Expenses
10,000.00
10,000.00
10,000.00
Adjusted Gross Income
$133,162.75
$136,218.27
$ 55,904.26
Corrected
Adjusted Gross Income Per
12,159.67
16,601.00
5,650.00
Returns
Additional Income
$121,003.08
$119,617.27
$ 50,254.26
The following schedules show respondent's determinations of the items of assets and liabilities entering into his reconstruction of Iaconi's total income and unreported income for the years 1945-1950 (except the details relating to United States Savings Bonds and automobiles): ASSETS
CASH IN BANKS
Peoples * *300 Worcester *
Worcester*
Miami *
Dec. 31
Savings
Savings
Checking
Checking
Totals
1944
$4,766.39
$1,354.88
$ 319.25
0
$ 6,440.25
1945
8,266.28
1,382.10
1,032.36
$3,861.76
14,452.50
1946
8,427.71
5,764.74
722.76
3,139.84
18,055.05
1947
597.09
826.82
877.96
2,032.54
4,334.41
1948
609.09
843.43
820.42
3,883.64
6,156.58
1949
$4,224.50
$ 860.37
$4,711.84
$ 843.51
$10,640.22
1950
821.78
2,138.50
510.17
852.18
4,322.63
REAL ESTATE
Shrews-
Mill-
Berkeley
bury
Dec. 31
Westerly
bury
Street
Street
1944
$20,400
$2,200
$7,500
$14,256.49
1945
21,400
2,110
7,500
13,721.88
1946
22,400
2,020
7,500
15,187.27
1947
22,400
1,930
7,500
14,652.68
1948
22,400
1,840
7,500
14,118.05
1949
22,400
1,750
7,500
13,583.44
1950
22,400
1,660
7,500
13,048.83
REAL ESTATE
Wor-
Dade
cester
County
Miami
Dec. 31
Street
Florida
Beach
Totals
1944
$15,000
0
0
$57,556.49
1945
15,000
$3,250
0
62,981.88
1946
15,000
3,250
0
65,457.27
1947
3,250
0
49,732.68
1948
3,250
$28,413.82
77,521.87
1949
3,250
28,413.82
76,897.26
1950
0
28,413.82
73,022.65
MORTGAGES AND LOANS RECEIVABLE
Dec. 31
Luzzi
Lallo
Bailey
Qualey
Totals
1944
$2,300
0
0
$1,500
$ 3,800
1945
2,300
0
0
1,500
3,800
1946
2,300
0
0
1,500
3,800
1947
2,300
$1,000
0
0
3,300
1948
2,300
9,000
0
0
11,300
1949
2,300
8,500
$20,000
0
30,800
1950
2,300
0
0
0
2,300
INVESTMENTS
Central Wholesale Grocers
Dec. 31
Capital Stock
Paid-in Surplus
Loans Payable
Due Officers
1944
$40,000
$ 29,071.52
0
0
1945
40,000
29,071.52
$5,000.00
0
1946
40,000
35,271.52
5,310.05
0
1947
40,000
42,766.42
0
0
1948
40,000
172,832.92
0
$4,907.25
1949
40,000
172,832.92
0
4,907.25
1950
40,000
172,832.92
0
4,907.25
East Side Package Corp.
Dec. 31
Capital Stock
Loans Payable
Notes Payable
1944
$5,000
0
$8,750.00
1945
5,000
$ 9,035.22
8,750.00
1946
5,000
1,300.00
7,785.22
1947
5,000
0
0
1948
5,000
0
0
1949
5,000
0
0
1950
5,000
10,000.00
0
*301 J.A.B. Realty
Dec. 31
Capital
Land
1947
$ 69,000
$15,000
1948
134,500
15,000
1949
138,300
15,000
1950
138,300
15,000
Cosmopolitan Finance Co.
Dec. 31
Capital
1944
$10,000
1945
10,000
1946
10,000
Total Investments
Dec. 31
Total
1944
$ 92,821.52
1945
106,856.74
1946
104,666.79
1947
171,766.42
1948
372,240.17
1949
376,040.17
1950
386,040.17
ANNUITIES & ENDOWMENT POLICIES *
Annuities
Policy No.
1944
1945
1946
1947
064,492
$ 9,049.35
$ 9,049.35
$ 9,049.35
$ 9,049.35
071,305
9,269.38
11,881.38
12,730.70
12,730.70
064,940
7,691.19
9,548.14
9,548.14
9,548.14
N. Y. Life
10,492.30
10,492.30
10,492.30
10,492.30
0,132,447
2,000.00
3,941.60
0,136,619
14,818.08
14,818.08
0,156,717
0
17,393.81
0,174,044
0
0
0,198,855
0
0
0,132,448
2,000.00
4,922.38
0,136,621
10,980.86
10,980.86
0,160,146
0
27,486.60
0,174,045
0
0
0,198,856
0
0
ANNUITIES & ENDOWMENT POLICIES *
Annuities
Policy No.
1948
1949
1950
064,492
$ 9,049.35
$ 9,049.35
$ 9,049.35
071,305
12,730.70
12,730.70
12,730.70
064,940
9,548.14
9,548.14
9,548.14
N. Y.Life
10,492.30
10,492.30
10,492.30
0,132,447
5,854.66
7,730.18
9,568.85
0,136,619
14,818.08
14,818.08
14,818.08
0,156,717
17,393.81
17,393.81
17,393.81
0,174,044
0
10,786.80
10,786.80
0,198,855
0
39,316.73
47,221.74
0,132,448
4,922.38
7,744.97
9,583.64
0,136,621
10,980.86
10,980.86
10,980.86
0,160,146
27,486.60
27,486.60
27,486.60
0,174,045
0
12,348.40
12,348.40
0,198,856
0
39,316.73
54,819.95
*302 Endowment Policies
Policy No.
1944
1945
1946
1947
1948
1949
79,945,893
$513.50
$547.30
$581.10
$614.90
$648.70
0
79,945,894
513.50
547.30
581.10
614.90
648.70
0
83,276,182
450.00
481.20
512.40
543.60
574.80
$606.00
80,008,457
474.00
505.20
536.40
567.60
598.80
0
80,008,458
474.00
505.20
536.40
567.60
598.80
0
83,276,179
450.00
481.20
512.40
543.60
574.80
606.00
19,975,367
397.50
423.50
449.50
475.50
501.50
0
19,975,368 *
397.50
423.50
449.50
475.50
501.50
0
Total Annuities and Endowments
Dec. 31
Total
1944
$ 40,172.22
1945
44,885.57
1946
75,778.23
1947
125,767.02
1948
152,006.75
1949
230,955.65
1950
256,829.22
LIABILITIES
MORTGAGES PAYABLE *
Dec.
Met.
Lom-
31
Peoples
W.G.B.T.
Life
bardi
1944
$3,000
0
0
0
1945
3,000
0
0
0
1946
0
0
0
0
1947
0
$18,450.00
0
0
1948
0
14,426.89
$13,523.55
$8,000
1949
0
0
12,465.75
8,000
1950
0
0
3,189.76
8,000
LOANS PAYABLE
Totals
Dec.
East Side
Mechanics
Mtgs.
31
Package Co.
Natl. Bank
& Loans
1944
0
0
$ 3,000.00
1945
0
0
3,000.00
1946
0
0
0
1947
$3,914.78
0
22,364.78
1948
4,422.86
$124,671.67
165,044.97
1949
5,232.86
124,000.00
149,698.61
1950
6,983.52
92,000.00
110,173.28
On October 9, 1950, Iaconi filed *303 with the collector of internal revenue for the district of Massachusetts amended individual income tax returns for each of the taxable years 1946 through 1949. Each of such amended returns disclosed adjusted gross income in an amount greater than that shown in the income tax return timely filed for each taxable year. Each of such amended returns was accompanied by the payment of an additional amount of tax arrived at by subtracting the amount previously paid from the amount of tax shown to be due on the amended returns. The following tables show Iaconi's gross income and the tax paid thereon as reported on the original and the amended income tax returns: Original Returns of Iaconi
Gross
Date of
income
Income
Year
Filing
Reported
tax paid
1946
March 8, 1947
$12,350.00
$2,995.35
1947
March 15, 1948
11,475.00
2,679.47
1948
March 15, 1949
12,159.67
2,552.21
1949
Feb. 21, 1950
16,601.00
4,349.61
Amended Returns of Iaconi,
filed October 9, 1950
Difference
over
gross income
Gross
reported
Additional
income
on original
income
Year
reported
return
tax paid
1946
$16,450.00
$4,100.00
$1,699.08
1947
15,725.00
4,250.00
1,691.24
1948
16,374.67
4,215.00
1,573.51
1949
20,466.00
3,865.00
1,723.48
In the amended returns for 1946-1949, the amounts of income *304 from a source described as "various business ventures" (undisclosed) for these years were increased. The following schedule shows the amounts shown in the original returns from undisclosed sources described under such designation as "various business ventures," and the increased amounts from such sources which were reported in the amended returns: Total
Increase
Per
Per
Originally
Amend.
Amend.
Year
Reported
Returns
Returns
1946
$ 7,150
$11,250
$4,100
1947
7,500
11,750
4,250
1948
7,901
12,116
4,215
1949
12,701
16,566
3,865 In the amended returns no explanations were given to identify the actual sources of "other" income from "various business ventures." The differences in the amounts of gross income reported by Iaconi on each original income tax return for each of the years 1946 to 1949, inclusive, and the gross income reported in each amended return for each of those years is unreported income, but not all the unreported income for each year. On October 31, 1951, the collector for the district of Massachusetts made jeopardy assessments of income tax against Iaconi as follows: Year
Tax
Penalty
Interest
Total
1948
$ 60,000
$30,000
$9,457.81
$ 99,457.81 *
1949
80,000
40,000
7,810.41
127,810.41 **
1950
100,000
50,000
3,763.01
153,763.01 ***
On *305 December 19, 1951, the same collector made jeopardy assessments of income tax against Iaconi, as follows: Year
Tax
Penalty
Interest
Total
1945
$5,773.05
$3,212.40
$1,995.50
$10,980.95
1946
22,278.73
12,566.54
6,364.09
41,209.36
1947
59,689.25
33,363.20
13,469.33
106,521.78
1948
0
2,290.33
0
101,748.14 *
1949
27,036.78
19,992.56
2,856.64
177,696.40 **
1950
0
7,727.87
0
161,490.88 ***
Total
$599,647.51
Of the amounts which the respondent assessed in jeopardy in October and December 1951, the following amounts were collected within 6 years after assessment, leaving uncollected within 6 years the amounts set forth below: Assessments
Assessments
Tax Year
Collected
Uncollected
1945
0
$ 10,980.95
1946
$ 2,064.38
39,144.98
1947
1,953.38
104,568.40
1948
61,653.82
40,094.32
1949
1,903.56
175,792.84
1950
0
161,490.88
$67,575.14
$532,072.37
Neither Iaconi nor petitioner filed a bond to obtain a stay of collection as allowed by section 273(f), 1939 Code. Neither Iaconi nor petitioner has at any time agreed in writing to extend the period of limitations on the collection of the deficiencies here in dispute. On November 16, 1956, Angelo J. Iaconi filed a petition in the Probate Court for Worcester County, Massachusetts, for appointment as administrator of the *306 estate of Frank Iaconi, deceased. On December 12, 1956, the Probate Court appointed Angelo administrator of the estate. On January 21, 1957, the district director for the district of Massachusetts filed a proof of claim for deficiencies in income tax and additions to tax and interest, as follows, in the probate court proceeding: Taxable
Income
Additions
Year
Tax
to Tax
Interest
1945
$ 5,773.05
$ 3,212.40
$ 3,766.92
1946
22,278.73
12,566.54
13,200.15
1947
59,689.25
33,363.20
31,784.53
1948 Bal.-
30,000.00
17,775.00
1948
2,290.33
1949
80,000.00
40,000.00
33,000.00
1949
27,036.78
19,992.56
11,152.67
1950
100,000.00
50,000.00
35,250.00
1950
7,727.87
$324,777.81
$169,152.90
$145,929.27 With the exception of the filing of the proof of claim referred to above and the filing of the petitions in this Court in the instant cases, no action has been instituted in any court by the respondent or on behalf of the United States relative to the collection of the deficiencies here in dispute. Administration of the estate of Iaconi is still pending in the probate court. The respondent sent to Iaconi the statutory deficiency notices which gave rise to the instant proceedings on December 27, 1951 (Docket No. 39512, involving 1948, 1949, and *307 1950), and on January 18, 1952 (Docket No. 39511, involving 1945, 1946, and 1947). Iaconi filed his original income tax returns for the years involved here on the dates set forth below: Taxable
Date
Year
of Filing
1945
March 15, 1946
1946
March 8, 1947
1947
March 15, 1948
1948
March 15, 1949
1949
Feb. 21, 1950
1950
May 1, 1951
Iaconi filed amended returns for 1946, 1947, 1948, and 1949, on October 9, 1950. Iaconi did not file a declaration of estimated tax for 1950, and no estimated tax for 1950 was paid. Iaconi did not file his return for 1950 within the time prescribed by law. On February 9, 1951, both Iaconi and the respondent executed a "Consent Fixing Period of Limitations Upon Assessment of Income and Profits Tax" for the taxable year 1947, extending the time to June 30, 1952, within which the respondent might assess against Iaconi income tax for the year 1947, section 276(b), which was a valid waiver. The original returns filed by Iaconi for the years 1945-1950, were prepared in the offices of John J. M. O'Connor, public accountant, from information supplied by Iaconi. The amended returns filed by Iaconi for the years 1946-1949, inclusive, were prepared by William J. Delaney, an accountant *308 with offices in Boston. The returns were signed by Iaconi in the presence of Delaney. Iaconi paid Delaney $1,000 in currency in consideration for the preparation of his amended income tax returns for the years 1946-1949. Delaney is related to Dennis Delaney who was the collector of internal revenue in Massachusetts, in 1949. In the summer of 1950, a revenue agent, Chicarelli, was engaged in investigating Iaconi's returns for some of the years involved. After conferences were held in which Fusaro, Chicarelli, and Delaney participated, Iaconi filed the amended returns for 1946, 1947, 1948, and 1949. The use of the net worth method by the respondent, as modified to give credit for undeposited cash on hand, was not arbitrary and furnished evidence of unreported income. Various properties included in the net worth statement were only nominally in the names of others and were acquired with funds owned by Iaconi. The following schedule shows the total amount of income reported by Iaconi in his original returns and by Mary, individually, in their separate returns for the years 1945-1950, inclusive: 1945
1946
1947
1948
1949
1950
Iaconi
$ 7,749.61
$12,350.00
$11,475.00
$12,159.67
$16,601.00
$ 5,650.00
Mary
7,462.44
11,075.90
10,802.77
10,006.63
13,702.13
15,762.57
Total
$15,212.05
$23,425.90
$22,277.77
$22,166.30
$30,303.13
$21,412.57
Iaconi *309 had accumulated cash savings at the end of 1944, which were not deposited in banks, in the total amount of not more than $265,000. For the years 1945-1950, inclusive, Iaconi received income which he failed to report in at least the following amounts: 1945
$ 11,017.55
1946
14,703.89
1947
22,825.86
1948
22,918.34
1949
23,598.67
1950
14,244.84
Total
$109,309.15 The following is the net worth statement revised to give credit for undeposited cash on hand at the end of 1944-1949, in the amounts of $265,000 at the end of 1944; $249,500 at the end of 1945; $234,000 at the end of 1946; $197,000 at the end of 1947; $107,000 at the end of 1948; and $22,000 at the end of 1949. The revised statement gives credit for income reported in returns of Mary Iaconi, and takes into account income taxes paid on that income (as shown in respondent's original net worth statement): Summary: Revised Net Worth Plus Expenditures 12/31/44
12/31/45
1946
1947
Undeposited Cash
$265,000.00
$249,500.00
$234,000.00
$197,000.00
217,315.75
248,191.69
286,619.64
351,255.75
Net Worth, Dec. 31
$482,315.75
$497,691.69
$520,619.64
$548,255.75
Net Worth, Jan. 1
482,315.75
497,691.69
520,619.64
Net Worth Increase
$ 15,375.94
$ 22,927.95
$ 27,636.11
Est. Living Exp.
7,500.00
12,000.00
10,000.00
Tax Pd., Iaconi
1,718.28
1,487.84
5,097.00
Tax Pd., Mary
1,635.38
1,714.00
2,370.52
Corrected Income
$ 26,229.60
$ 38,129.79
$ 45,103.63
Income Reported
15,212.05
23,425.90
22,277.77
Unreported Income
$ 11,017.55
$ 14,703.89
$ 22,825.86
*310 12/31/48
12/31/49
12/31/50
Undeposited Cash
$107,000.00
$ 22,000.00
0
473,899.20
595,647.39
$632,354.09
Net Worth, Dec. 31
$580,899.20
$617,647.39
$632,354.09
Net Worth, Jan. 1
548,255.75
580,899.20
617,647.39
Net Worth Increase
$ 32,643.45
$ 36,748.19
$ 14,706.70
Est. Living Exp.
10,000.00
10,000.00
10,000.00
Tax Pd., Iaconi
519.30
4,470.08
9,197.56
Tax Pd., Mary
1,921.89
2,683.53
1,753.15
Corrected Income
$ 45,084.64
$ 53,901.80
$ 35,657.41
Income Reported
22,166.30
30,303.13
21,412.57
Unreported Income
$ 22,918.34
$ 23,598.67
$ 14,244.84
Iaconi acquired with his cash and owned the assets, subject to liabilities, set forth in respondent's revised net worth statement, having the respective costs determined. Exclusive of the undeposited cash on hand at the end of each material year, as determined here, Iaconi's net assets (net worth) at the end of the years 1944-1950, inclusive, had a cost to him of $217,315.75, $248,191.69, $286,619.64, $351,255.75, $473,899.20, $595,647.39, and $632,354.09. He paid income taxes of not more than the amounts set forth in the respondent's revised net worth statement. Mary reported income and paid income taxes in the amounts set forth in the adjusted net worth statement set forth herein, supra. *311 During each of the years 1945-1950, inclusive, Iaconi attempted to conceal his acquisition of assets by directing that they be held in the names Mary, Florence and Caroline; he attempted to conceal the receipt and the source of the funds used to purchase such assets by dealing exclusively in cash; he attempted to conceal the amounts of his personal living expenses by using an exchange account on the books of Central; and he attempted to conceal his true taxable income for each of the years 1946-1949, inclusive, by filing with the collector false and fraudulent amended returns with intent to evade tax for those years. Iaconi filed false and fraudulent returns with intent to evade taxes for the years 1945-1947, inclusive. Part of the deficiencies for 1945-1950, inclusive, was due to fraud with intent to evade tax. He filed false and fraudulent amended returns for the years 1946-1949, inclusive, with intent to evade tax. Iaconi's income in his returns for 1946 and 1947 was understated by amounts properly includible therein, respectively, which is in excess of 25 percent of the amount of gross income stated in the returns. For 1947, Iaconi filed a valid agreement on February 9, 1951, *312 under section 276(b). The assessment of income tax and additions to tax for each of the years 1945, 1946, and 1947 was not barred by section 275(a). Iaconi substantially underestimated his estimated tax for each of the years 1945-1949, inclusive, within section 294(d)(2). Iaconi's failure to file timely his return for 1950, and his failure to file a declaration of estimated tax for 1950 was due to willful neglect and was not due to reasonable cause. The stipulated facts are incorporated herein by reference and are found as stipulated. Opinion HARRON, Judge: The respondent's agents made an investigation in connection with auditing the returns of Iaconi for 1945-1950, inclusive. The investigators located a substantial amount of assets and found that in each year there were substantial increases in assets, the cost of which greatly exceeded the reported income for each year. Since Iaconi did not keep and maintain any records of annual income, the respondent resorted to a method which has been used frequently for reconstructing income, the net worth plus nondeductible expenditures method. "Where the taxpayer's increase in net worth is substantially in excess of his reported income, and *313 where the discrepancy cannot be reasonably explained as being attributuable to gifts, inheritances, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income. In determining the amount of net income for any such period, it is necessary to add all nondeductible expenditures made by the taxpayer during that period, for such expenditures represent additional unexplained resources available to the taxpayer, over and above the increase in net worth. Other deductions, such as deductions for depreciation, must also be made." Michael Potson, 22 T.C. 912, 927; affd. sub nom Bodoglau v. Commissioner, 230 F. 2d 336. The net worth method is not a system of accounting; it is not a substitute for the cash basis of accounting or any other method of keeping books. "When properly applied to the facts of a particular situation it is merely evidence of income." Morris Lipsitz, 21 T.C. 917, 931, affd. 220 F. 2d 871. Moreover, although the net worth method is not a method of accounting, it does serve to call upon taxpayers to account for their unexplained income. Holland v. United States, 348 U.S. 121, 75 S. Ct. 127, 129. The petitioner, at the outset, *314 protests respondent's net worth analysis and contends that it should not receive any recognition. It contends that it does not reasonably or accurately represent a determination of Iaconi's taxable income for the years involved and that the respondent's determinations of deficiencies are arbitrary and capricious. Petitioner criticizes several aspects of the original and the revised net worth statements of the respondent. Stated briefly, its main objections are: that the respondent did not include in the year-end amounts of assets on December 31, 1944 through 1950, any amount for accumulated, undeposited cash, of which petitioner contends Iaconi had a very substantial amount; and that respondent erred in including in the assets of Iaconi, assets owned by Mary Iaconi and others. In fact, petitioner's contention in this matter is that most of the assets which respondent attributed to Iaconi in each year were not his property, and, therefore, the net worth statement is inaccurate and unworthy of any recognition. The controversy is primarily one about facts, which has been resolved in large part by our findings of fact. All of the lengthy record has been fully and carefully considered. *315 Although we do not intend to discuss all of the evidence, we shall comment upon the chief points of difference between the parties hereinafter. We find and conclude that: (1) The respondent erred in not allowing the taxpayer credit for a substantial amount of accumulated, undeposited cash on December 31, 1944, the opening date of the net worth analysis. (2) The respondent erred in not including in the revised net worth statement, adjusted gross income reported by Mary in her individual returns and the amounts of income taxes paid by her. (3) The respondent did not err in his inclusion in assets, properties held in the name of Mary, and the schedule of assets in the entire net worth statement, as revised by the respondent, is approved. Petitioner's claim that there was a large amount of undeposited cash on hand at the end of 1944, in safes located in the Iaconis' home and in safe deposit boxes, is particularly difficult in this case because despite repeated requests of the Court that the petitioner state a definite or an approximate amount, allowing petitioner ample opportunity to do so, the petitioner declined. On brief, petitioner's counsel suggested that Iaconi had undeposited cash *316 on hand in January 1946 of at least $370,000. We have taken into account the whole record, the length of time before January 1, 1945, during which both Iaconi and Mary were gainfully engaged in several incomeproducing ventures, and the reasonableness of the inference that they had accumulated a substantial amount of cash (which was not deposited in any bank, where records would be maintained and preserved), which was secreted by them at home in safes, and in safe deposit boxes, and elsewhere. The testimony of Mary and others that she and her husband made and sold illegal (bootleg) liquor during prohibition is corroborated (to some extent, at least), and is accepted as credible. Also, there is evidence that Iaconi engaged in certain gambling businesses in Worcester up to the time of his conviction following the Bushnell raid, at least. Mary did not keep and maintain any records of the receipts of the illegal liquor business during the prohibition era, and she did not keep any records at all during the entire period involved of receipts of funds or expenses. Neither did Iaconi. On the other hand, there is testimony about the amounts of bundles of currency kept in safes in the Iaconi *317 home. Although such testimony, given by members of the Iaconi family, is self-serving and inexact, and although we are not entirely convinced that the estimate of the amounts of money kept in safes at certain times is accurate, we regard such testimony as credible to some extent, even though vague, and have given it some weight in arriving at our conclusion, which is based on the entire record. We think that the total amount of cash on hand, for which petitioner now contends, was considerably inflated by petitioner's witnesses. In the circumstances, and using our best judgment, based on a study of all of the evidence, we have in our Findings of Fact set forth our determinations of the amounts of the cash owned by Iaconi on December 31 of all of the years 1944 through 1950. Cf. Cohan v. Commissioner, 39 F. 2d 540, 544. With respect to all of the other assets attributed to Iaconi by the respondent in his final net worth analysis, consisting of real estate, annuities and endowment policies, mortgages and loans, Government bonds, and other items of property, we encounter the same difficulty as exists with respect to determining the amounts of undeposited cash on hand. Mary and her husband *318 did not keep their cash separately. Rather, their earnings and all of their other cash receipts were commingled. Since neither maintained a cash record, account books, or any record showing the ownership of cash, or any record of receipts from rents, business operations, or other sources, and since Mary (who testified) was unable to present any estimates of cash receipts from any or all sources, it is impossible to segregate assets paid for and owned, respectively, by Iaconi and Mary. Furthermore, Mary testified repeatedly that her husband wanted properties held in her name. Petitioner contends that a large part of the assets attributed to Iaconi in the net worth statement were acquired and owned by Mary, but petitioner failed to establish that fact by competent proof. Petitioner, on this point, relies upon Mary's testimony, but it was vague and we are unable to find it credible. Under all of the circumstances and upon careful consideration of the whole record, it is concluded that it was proper and reasonable for the respondent to include in the revised net worth statement, as Iaconi's assets, several kinds and items of real and personal property held nominally in the names of Mary *319 and some of their children. However, in view of the commingling of funds and the inability of the petitioner to trace the purchase price of any item of property to the funds of Mary or any other person, we believe that respondent should have made adjustments in the net worth statement reflecting the family arrangements of Iaconi and his wife. We have used our best judgment and have made such adjustments. In so doing, we have in some instances adopted the treatment accorded to certain items by the respondent in his original net worth statement, which, in this respect we believe was correct. That is to say, although the Iaconis filed separate returns, we are obliged to believe, on the whole record, that Mary, in reporting rents and other income in her returns, actually reported some of the income of Iaconi. Therefore, we have included in the net worth statement, income reported by Mary in her returns and income taxes paid by her thereon. There is some inexactness in so doing, because Mary reported in her returns, inter alia, salary payments from East Side Package Store. However, in view of the admitted commingling of funds, we believe it is necessary to allow Iaconi credit for all of *320 the income reported in Mary's returns, thereby giving him the benefit of all the reported income for the taxable years and all the income taxes which were paid. With such adjustments, we find and conclude that the respondent's revised net worth analysis, as modified here, constitutes a reasonable indication that Iaconi realized and failed to report income in at least the amounts stated in the Findings of Fact. In our determination of the amount of cash on hand at the end of each of the years covered by the net worth statement, we have taken into account the entire record and the testimony relating to estimates of the amounts of cash kept in safes in the Iaconi home. We hold and conclude that for each of the years 1945-1950, inclusive, there are income tax deficiencies. However, they will be substantially less than the respondent determined. In arriving at our determinations, we have been mindful of the admonition in the Holland case that the net worth method should be carefully applied lest any real violence be done to the rule that current income is reported and taxed on an annual basis, fiscal year or calendar year, and that it is improper to lump into one taxable year, earnings *321 of other years which have been accumulated. We turn now to the issues relating to fraud, additions to the tax and the deficiencies, and the statute of limitations. Petitioner contends that the respondent has failed to establish a likely source of current income, represented by the net worth increases, during each of the years involved. It also argues that the respondent failed in establishing a source from which the net worth increases sprang and that such failure forecloses the use of the net worth method here. In support thereof it cites the cases of Thomas v. Commissioner, 232 F. 2d 520; Commissioner v. Thomas, 261 F. 2d 643. In Holland v. United States, supra, the Supreme Court, in considering the use of the net worth method in the enforcement of the criminal sanctions of the income tax laws, stated: One basic assumption in establishing guilt by this method is that most assets derive from a taxable source and that when this is not true the taxpayer is in a position to explain the discrepancy. The application of such an assumption raises serious legal problems in the administration of the criminal law. The Supreme Court indicated that it was concerned about the practical necessity *322 of a defendant's having to take the stand in a criminal case to explain the discrepancies between the amounts shown as net worth increases and his reported income, which problem existed in a line of cases following United States v. Hornstein, 176 F. 2d 217. The Supreme Court, in the Holland case, prescribed certain prerequisites for the use of the net worth method in criminal cases among which was "proof of a likely source from which the jury could reasonably find that the net worth increase sprang." However, in a civil proceeding a party opponent can be called to testify. Wigmore on Evidence (3rd Ed. 1940) Volume VIII, Section 2218. Therefore, there is less cause for concern in a civil case over a taxpayer's having to take the stand to explain large discrepancies between his net worth increases and his income as reported in his return. The Supreme Court recognized this distinction when it said in Holland: Unlike civil actions for the recovery of deficiencies where the determinations of the Commissioner have prima facie validity the prosecution must always prove a criminal charge beyond a reasonable doubt. In William G. Lias, 24 T.C. 280, affd. 235 F. 2d 879, cert. denied 353 U.S. 935, *323 we said: We find no merit to the claim that the respondent has not shown any source of income that would account for the increase in the petitioner's net worth. In view of the very large discrepancy between the net income, as reported, and the cost of assets acquired, plus the nondeductible expenses, we think it is not incumbent upon the respondent to show any specific amounts of income omitted from petitioner's return. Kite v. Commissioner, 217 F. 2d 585, * * *. We believe that the record before us establishes likely sources of Iaconi's income, and, furthermore, that one source was some sort of gambling enterprise or business operated by Iaconi. In the individual income tax returns of Iaconi for each of the taxable years 1945-1949, inclusive, he stated that he received income "from various sources" and from "various gains". He filed amended returns for each of the taxable years 1946-1949, inclusive, in which he again stated that he had taxable income from "various business ventures". However, neither the sources nor the amounts derived from any particular source were specified. The taxable income so represented was in addition to the income which Iaconi stated was received from *324 Central, the only source of income which the petitioner maintains was available to Iaconi. In April 1950, Iaconi stated to two agents of the Federal Bureau of Investigation that he was engaged in the gambling business and that he was a gambler and a bookmaker. Both agents testified in this proceeding. The circumstances surrounding this statment by Iaconi were as follows: The FBI agents were investigating an alleged theft of goods from an interestate shipment. They apparently had reason to believe that an associate of Iaconi was involved and they contacted Iaconi solely for the purpose of determining the whereabouts of that individual. It is clear from their testimony that Iaconi himself was in no way suspect. The agents testified that Iaconi told them that he did not know the whereabouts of the person under investigation. He then volunteered the information that he was a gambler; that gambling and bookmaking were his business; that he was the boss of gambling in Worcester; and that he saw to it that his associates received sufficient remuneration for their participation so that it was unnecessary for them to engage in other activities. Such alleged statements by Iaconi, when considered *325 in the light of the fact that he was not the subject of the investigation, that the investigating officers had no jurisdiction over gambling activities, and that an associate was under suspicion, apparently were made by Iaconi in attempting to clear an associate of an alleged crime, and to that end were made in such way as to show a reasonable basis for such effort. Angelo and Salvatore testified that the agents misunderstood Iaconi and that he had used the past tense and had stated that gambling and bookmaking in the past, had been his business. It is our view that the testimony of the two agents is entitled to more weight than the testimony of Angelo and Salvatore. Respondent was faced with a most difficult task in undertaking to prove that during the taxable years a source of Iaconi's income was the gambling business. Nevertheless, he called two FBI agents who were trained investigators and we are unable to ignore their testimony which was neither refuted nor discredited. To require that the respondent prove meticulously that Iaconi carried on a gainful gambling business "would be tantamount to holding that skillful concealment is an invincible barrier to proof." United States v. Johnson, 319 U.S. 503. *326 Respondent maintains that the 3 corporations, the stock of which was owned by the Iaconis, provides another likely source of the net worth increases, particularly in view of the manner in which the corporations' affairs were conducted. The record clearly establishes that the funds of these corporations were under Iaconi's control. Assets were purchased by Iaconi for the corporations and in many instances loans were made by the corporations to Iaconi or Mary, and to the corporation by them. Iaconi was in a position to, and did, freely draw upon the corporations' funds. It is well established that where the net worth method establishes a substantial gap between net worth increases and the income shown in a taxpayer's books and records, or returns, such gap is cogent evidence that the returns and records are either inadequate, incorrect, or false. Morris Lipsitz, supra; cf. Holland v. United States, supra. Such wide discrepancy exists here. Furthermore, the respondent has proved sources of the net worth increases. Petitioner objects to the admissibility of the testimony of a revenue agent and the two FBI agents about the admissions made by Iaconi. He relies on the surviving party *327 statute of the District of Columbia Code, sec. 14-302. It is clear from the precise wording of the statute and the opinions in Rosinsky v. Whiteford, 184 F. 2d 700, and Prior v. Bond, 110 A. 2d 539, that the statute was intended to apply solely to testimony by a plaintiff or his agents as to admissions by a deceased or legally incapable person in a proceeding against the representative of the deceased or legally incapable person. Further support for this view is found in Wigmore on Evidence (3d Ed. 1040) Vol. IV, § 1081, wherein it is stated: No modern court doubts that a decedent whose rights are transmitted intact to his successor is a person whose admissions are receivable against a party claiming the decedent's rights as heir, executor, or administrator. Our conclusion is that the testimony of the two agents of the FBI, and of the revenue agent is admissible and entitled to consideration. We are unable to agree with the petitioner's contention that the respondent failed to establish a likely source of the income shown by the annual net worth increases. Cf. United States v. Massei, 355 U.S. 595. We turn now to the matter of the amended returns for 1946-1949. For each of the *328 taxable years 1946 to 1949, inclusive, Iaconi filed returns and paid tax in the amounts shown thereon. On October 9, 1950, Iaconi attempted to amend each of these returns by filing an additional tax form labeled "Amended Returns". Each additional form showed gross income and tax in larger amounts than the original return. For each of these years, Iaconi paid more tax in the amount of the difference between the tax shown on the amended returns, plus interest, and the tax shown on the original returns. The respondent contends that the amended returns constitute admissions by Iaconi that he understated his income for each of the years in question. The petitioner contends that the amended returns are uncorroborated and must, because of the circumstances connected with their filing, be ignored by this Court. The petitioner claims that Iaconi had reason to believe that some of his income tax returns were under investigation and that upon such basis, any statement by Iaconi in the amended returns must be deemed unreliable because they were motivated by a desire to effect a settlement rather than to establish the correct amount of his income. The petitioner relies on Smith v. United States, 348 U.S. 147; *329 Holland v. United States, supra, and United States v. Calderon, 348 U.S. 160. While these cases involved issues under the criminal statute, we find that the guideposts which they furnish with respect to the net worth method are helpful. It does not follow, however, that all the evidentiary requirements which are necessary to sustain a criminal conviction are equally applicable to a civil proceeding such as this, in which only the taxpayer's liability for tax is at issue. It has been established that Iaconi signed the so-called amended returns and that they were filed in his behalf. In signing them, he attested their correctness under penalties of perjury. It is immaterial that he may have signed them because of a desire to make a settlement. In our view, any claim or suggestion of unreliability of the amended returns carries with it, to an equal extent, the implication that Iaconi perjured himself in signing them. The petitioner, on brief, relies heavily on the presumption of innocence rule and quotes from Jones on Evidence (2d Ed. 1926), sec. 44, p. 82, as follows: Perhaps there is no presumption more highly favored in the law than that of innocence… The favor with which this presumption *330 is regarded in the law is illustrated in this, that when misconduct or crime is alleged, whether in a criminal or in a civil suit, whether in a direct proceeding to punish the offender or in some collateral matter, the accused is presumed to be innocent until proved guilty. This is also illustrated by the fact that other presumptions are so often said to yield to that of innocence, and by the fact that although ordinarily the burden of proof is on the one asserting the affirmative of the issue, yet if proof of a negative is necessary to establish guilt, such proof must be made. The petitioner offered no evidence in support of its argument that the amended returns are not reliable, and we cannot presume perjury. We are not impressed by petitioner's contention that Iaconi believed that the amended returns would "close the case" against him and that otherwise he would not have filed information tending to show that the original returns were not correct. Section 3760, 1939 Code, authorizes closing agreements under which a taxpayer's liability may be conclusively and finally agreed upon. However, the petitioner has presented no evidence that such a closing agreement was either undertaken *331 or completed. In the absence of such evidence, we are unable to give credence to the contention that a man of Iaconi's acumen, intelligence, and access to expert counsel believed that the gesture of filing amended returns would end all inquiry and investigation by the Commissioner of his returns. He might have hoped that matters would move more favorably through his cooperation, but it has not been shown that he had any assurance which was more substantial than mere hope. We see no reason for not giving consideration to the amended returns. They were received in evidence. Iaconi attested that the amended returns, filed on October 9, 1950, correctly set forth his income for the years 1946-1949. Petitioner has failed to show that the amended returns do not represent an admission that Iaconi failed to report all of his income in his original returns. The next question is whether the determination of any deficiency is barred. The assessments of deficiencies for 1946 and 1947 were made more than 3 years but less than 5 years after the original return for each year was filed. The assessments of deficiencies for the taxable years 1946 and 1947 are barred under section 275(a) unless an exception *332 to the 3-year period of limitations exists. The exception provided by section 275(c), which provides a 5-year period for the assessment of deficiencies where the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, is considered first. We find that Iaconi understated his income for each of the years 1946 and 1947 by more than 25 percent. Therefore, 5-year period for the assessment of deficiencies applies, and the respondent's determinations for 1946 and 1947 (made in January, 1952) are not barred. On February 9, 1951, Iaconi and the respondent executed a waiver extending the time for assessment of tax for 1947. The petitioner vigorously challenges the validity of this waiver. Our conclusion above obviates the necessity of considering whether the waiver, under section 276(b), was valid. The respondent determined that Iaconi filed false and fraudulent returns with intent to evade tax. Under section 276(a), where a false or fraudulent return is filed with intent to evade tax, the tax may be assessed at any time. Under this issue, the respondent has the burden of proof. Fraud is never *333 presumed; it must be established by clear and convincing proof. Since direct proof of fraud is seldom possible, fraud may be shown by evidence relating to the taxpayer's conduct and the nature and extent of omissions of income from returns, if any. Arthur M. Godwin, 34 B.T.A. 485; M. Rea Gano, 19 B.T.A. 518; Wallace H. and Eula J. Petit, 10 T.C. 1253; Walter M. Ferguson, Jr., 14 T.C. 846; L. Glenn Switzer, 20 T.C. 759; Leon Papineau, 28 T.C. 54; and Wiseley v. Commissioner, 185 F. 2d 263. On the record before us, we are satisfied that the respondent has met his burden for each of the taxable years 1945 to 1950, inclusive. Iaconi's plea of guilty to a charge of criminal tax evasion for 1948 constituted an admission against interest and is sufficient to establish fraud for that year. Leon Papineau, supra. However, the guilty plea is by no means the only evidence of fraud for the year 1948. We consider the guilty plea as evidence of fraud for 1948, only. Iaconi kept no records of his income for any of the taxable years. This failure is evidence of fraud. Henry B. and Rose R. Mikelberg, 23 T.C. 342. He dealt exclusively in cash and with cash acquired various assets. Such manner *334 of transacting business has been held to be indicative of fraud. Iaconi died before the trial of this case. We do not have the benefit of his testimony. Nevertheless, there is substantial evidence about his conduct of and method of looking after his affairs. When consideration is given to the repetitious pattern of understatements of income for the years 1945-1950, inclusive, the secrecy about the sources of the bulk of Iaconi's reported income, and his failure to keep records, in addition to his plea of guilty to criminal tax evasion for the year 1948, which we have considered only with respect to that year, we are satisfied that the respondent has carried his burden of proving that the petitioner filed false and fraudulent returns for all of the years involved and that part of the deficiency for each of the years 1945 to 1950, inclusive, was due to fraud with intent to evade tax. The chief controversy here relates to respondent's resort to the net worth method and his reconstruction of Iaconi's income for several years by that method. It was used by respondent because Iaconi did not have any records of his income. Petitioner now contends that there was no need for Iaconi's maintaining *335 any accounting records. It argues that Iaconi's only income was from salary from Central. That is not correct. Iaconi reported in his returns income from other business operations which were not identified. The record here shows that under all of the circumstances the respondent was not only justified but obliged to reconstruct Iaconi's income by use of some accepted method, and the net worth method is an accepted and frequently used method. Petitioner argues that Iaconi's failure to maintain records of his income is not indicative of any willful intent to evade taxes, and that, rather, his lack of knowledge of the procedure for keeping such records was the reason for the lack thereof. We are unable to accept such explanation and cannot conclude that the admitted understatements of income, as shown by the amended returns for certain years, which understatements amounted to several thousand dollars in each consecutive year, was due to mere ignorance of bookkeeping methods or carelessness. Walter M. Ferguson, supra., L. Glenn Switzer, supra.Although Iaconi may not personally have been qualified to fulfill all the technical details relative to his duties and obligations under the *336 Internal Revenue laws, the record shows conclusively that he consistently availed himself, during all the years before us, of expert professional counsel and assistance in law and accounting. The only conclusion which can be made upon the record before us is that Iaconi followed a consistent practice of concealing his receipts of income and the sources thereof, and that his failure to maintain ordinary records of his income, as required by section 41 for the purpose of reporting income for tax, was part of his policy of concealing his income. Upon careful consideration of the whole record and all of the contentions of the petitioner, it is concluded that the respondent has carried his burden of proving that false and fraudulent returns were filed with intent to evade tax for the years 1945 through 1947, and for 1948 through 1950, and, also, that part of the deficiencies, at least, for each year, was due to fraud with intent to evade tax. Therefore additions to the deficiencies under section 293(b) are required; and assessments of deficiencies for 1945-1947, inclusive, are not barred by the statute of limitations. There remain questions relating to additions to tax. We shall consider *337 first the additions determined under section 294(d)(2) for 1945-1949, inclusive. Petitioner had the burden of proving error in the determinations. William G. Lias, supra.Petitioner failed to offer any evidence with respect thereto. With respect to respondent's claims for increases in the additions for certain years, he had the burden of proof. However, under our findings probably there will not be increases in the additions. If there are such increases, respondent met his burden of proof. It follows from the findings and conclusions reached here that there was substantial underestimation of the estimated tax for each of the years 1945 through 1949. Additions to taxes under section 294(d)(2) are required. The amounts thereof are to be recomputed under Rule 50. For the taxable year 1950, the respondent has determined that Iaconi failed timely to file an income tax return and also failed to file any declaration of estimated tax. The respondent determined that these failures were not due to reasonable cause, and therefore, determined additions to tax under section 291(a), for failure to file a return within the time prescribed, under section 294(d)(1)(A), for failure to file a declaration *338 of estimated tax within the time prescribed, and under section 294(d)(2) for substantial underestimation of estimated tax. The petitioner does not contest the facts of failure to file either a timely return or declaration of estimated tax; he contests only the amounts of the additions to tax. We sustain additions to tax under sections 291(a) and 291(d)(1)(A), the amounts to be computed under Rule 50. We cannot, however, sustain the imposition of an addition to tax under section 294(d)(2) for substantial underestimation of estimated tax. A taxpayer who has failed to file any declaration of estimated tax may not on account of that failure, be deemed to have understimated the estimated tax. Commissioner v. Acker, 361 U.S. 87. The only question remaining is whether any period of limitations imposed under section 276(c), on the collection of tax after assessment, bars the collection within the 6 year period following each jeopardy assessment. This issue arose shortly after the trial of these cases because of the expiration of a period of 6 years following each of the 2 jeopardy assessments. The petitioner raised the issue by amendments to his pleadings. Thereafter, upon a further hearing, *339 supplemental briefs were filed. Briefly stated, it is the petitioner's contention that the 6 year period of limitations on collections after assessment provided in section 276(c) is not suspended by the filing of a petition in this Court, and that the respondent is therefore barred from collecting any uncollected portion of the deficiencies which were the subject of the jeopardy assessments of October and December, 1921. In supporting his position, the petitioner has placed a strained construction on the applicable statutory provisions and their legislative history. We agree with the respondent that if sections 276(a) and 277 are accorded their ordinary meaning, the statute of limitations for the collection of deficiencies is suspended when a petition is filed in this Court until the decision of this Court becomes final and for 60 days thereafter. Section 277 provides as follows: The running of the statute of limitations provided in section 275 and 276 on the making of assessments and the beginning of distraint or a proceeding in court for collection, in respect of any deficiency, shall (after the mailing of a notice under section 272(a)) be suspended for the period during which the *340 Commissioner is prohibited from making the assessment or beginning distraint or a proceeding in court (and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Board [Tax Court], until the decision of the Board [Court] becomes final), and for sixty days thereafter. (Italics supplied). The language of section 277 appears to us to be subject to only one plain meaning and reasonable interpretation, namely, that no matter what other circumstances may exist, bringing a proceeding before this Court suspends the running of the statute of limitations until our decision has become final. As the statute unequivocally so provides, while a case is before us, the running of the statute is suspended. We find no merit in the petitioner's contentions to the contrary. See W. P. Brown & Sons Lumber Company v. Burnet, 282 U.S. 283. Decisions will be entered under Rule 50. Footnotes
*. The names of the banks are: Peoples Savings Bank, Worcester County Institution for Savings, Worcester County Trust (checking account), and Miami First National Bank (checking account).
*. All John Hancock except 1 New York Life Ins. Co. annuity.↩
*. John Hancock; others, Prudential.↩
*. Mortgages payable to: Peoples Savings Bank, Worcester Guaranty Bank & Trust Co., Metropolitan Life Ins. Co., & Lombardi.↩